**CONSOLIDATION COAL COMPANY, Appellant,**

v.

**LOCAL 2216, UNITED MINE WORKERS OF AMERICA, Respondent.**

No. 84–2830.

United States Court of Appeals, Seventh Circuit.

Argued May 22, 1985.

Decided Dec. 18, 1985.

Paul J. Schroeder, Jr, Spoehrer & Lemkemeier, St. Louis, Mo., for appellant.

James D. Lynch, Springfield, Ill., for respondent.

Before BAUER, Circuit Judge, COFFEY, Circuit Judge, and CAMPBELL, Senior District Judge.*

WILLIAM J. CAMPBELL, Senior District Judge.

Petitioner, Consolidation Coal Company (the Company), employs members of respondent, United Mine Workers of America, Local 2216 (the Local or the Union). On January 8, 1982, members of the Union engaged in a 24-hour wildcat strike. The Company seeks damages from the Local's treasury for production time it lost during the 24-hour walkout. The Company bases union liability on both "mass action" and common law agency theories. At a trial in the United States District Court for the Southern District of Illinois cross-motions for summary judgment were filed based on stipulated facts. Judge William Beatty granted summary judgment in favor of respondent Union. In doing so, Judge Beatty also adopted part of a decision written by Chief Judge James L. Foreman in *Old Ben Coal Company v. Local Union No. 1487 of the United Mine Workers of America*, 601 F.Supp. 1061 (D.C.Ill.1984), which held local unions cannot be found liable under the "mass action" theory of liability but only under traditional common law agency principles. The Company appeals Judge Beatty's adoption of the *Old Ben* holding, believing the mass action theory should still be viable as a separate theory of liability when pertaining to local union liability. The Company also appeals Judge Beatty's granting of summary judgment to the Union, claiming a genuine issue of material fact exists even along common law agency principles as to whether union leaders supported, encouraged or ratified the wildcat strike.

## I

The mass action theory of liability was brought to the forefront of American labor law in 1948 in *United States v. International Union, United Mine Workers of America*, 77 F.Supp. 563 (D.C.Cir.1948).

The case centered around a bitter dispute between United Mine Workers (UMW) President John L. Lewis and companies/signatories of the National Bituminous Coal Wage Agreement of 1947 (the Coal Wage Agreement). The dispute between Lewis and his employing companies became so bitter and of such national import that the Attorney General and President of the United States became involved. Lewis believed the Coal Wage Agreement mandated that miners with more than twenty years experience and over sixty years of age should have a $100 per month pension irregardless of whether they were currently employed. Company representatives who signed the Coal Wage Agreement either disagreed or were in no hurry to affirm this provision of the agreement. Lewis, believing some of the signers of the Coal Wage Agreement were reneging on an issue of great import to his union, wrote a letter to the signatories of the Coal Wage Agreement which stated in part:

"The National Bituminous Coal Wage Agreement of 1947 required, among other things, the designation of a pension fund ... [s]even months after the effective date of the Agreement, Your Representative Trustee, Mr. Ezra Van Horn of Cleveland, Ohio, continues (as he has consistently continued) to thwart the fulfillment of that contractual obligation. It now constitutes an outstanding, unresolved dispute, national in scope and character ... The United Mine Workers of America, therefore, now advise you as a signatory to the Agreement that it reserves the right at will to take any independent action necessary to the enforcement of the contract." *Id.* at 565.

One month after this warning, 350,000–450,000 coal miners went on strike. Approximately one week after the commencement of the strike, President Harry S. Truman appointed a special Board of Inquiry to study the strike, believing it to be threatening the nation's health and safety. (The

* The Honorable William J. Campbell, Senior United States District Judge of the Northern District of Illinois, is sitting by designation.

President was authorized to appoint the Board of Inquiry under the Taft-Hartley Act of 1947 which, incidentally, was codified in the same year as the Coal Wage Agreement.) The Board of Inquiry concluded the strike was indeed imperiling the national health and safety. Subsequently, President Truman directed the Attorney General to file a complaint for injunctive relief against the striking United Mine Workers which would prohibit the continuation of the strike until the merits and national impact of the strike could be determined. In response to this complaint, the District Court issued a temporary restraining order mandating the miners go back to work until a full judicial investigation could determine whether the nation's health/safety was in fact imperiled. If it was deemed not to be imperiled, the miners would be allowed to strike; otherwise, work had to continue at the mines.

In response to the court order to temporarily terminate the strike, Union President Lewis strategically declared there was in fact *no* organized strike; i.e., that the miners left the mines entirely of their own individual volition and without any instructions from union officials. Therefore, Lewis argued, even though he was the leader of the United Mine Workers, he could not be viewed as the catalyst who could bring the workers back en masse.

The strike continued. The court reached the conclusion that contempt proceedings against Lewis would have to be initiated. Yet first it had to refute Lewis' argument there was no strike sanctioned by the union; that union officials never orchestrated the strike in some way.

It is from the quagmire of national dimensions described above that the court established the mass action theory of liability. The court concluded Lewis must have orchestrated the massive walkout, ratifying what had all the elements of a neatly organized strike in some material way. The court used the following logic:

"It is perfectly obvious not only in objective reasoning but because of experience that men don't act collectively without leadership. The idea of suggesting 350,000 to 450,000 men would all get the same idea at once, independently of leadership, and walk out of the mines is of course simply ridiculous." *Id.* at 566.

Significantly, the court also pointed to the language of Lewis' letter to the signatories of the Coal Wage Agreement quoted above. For example, when Lewis stated in this letter he reserved the right to take "independent action" to enforce the Coal Wage Agreement the court concluded, "What independent action could be taken by them, except strike?" *Id.* at 566. The court also referred to letters Lewis wrote to his own union members which had the effect of calling for a strike. In sum, the court, fully considering the national crisis growing from Lewis' conduct/tactics, concluded, ". . . that a union that is functioning must be held responsible for the mass action of its members." Hence, the "mass action theory" was born and as a result Lewis was found guilty of criminal contempt in defying a court order to instruct his union members to return to work. One caveat is appropriate here: The court did put one qualifier into its analysis of when the mass action theory should be invoked:

"Of course, if a union comes in and says 'We have lost our hold on our members; . . .' . . . and if they can show the Court by legitimate testimony that that is true, they are not guilty . . ." *Id.* at 567.

## II

Over the years the mass action theory of liability has become quite controversial. Some legal authorities continue to find the theory viable if used to attach liability for a strike to a local union, as opposed to district or international unions. The logic here is that a local union, close to its members, must ultimately be held liable for the mass action of its members, especially when they engage in a wildcat strike in violation of a no-strike pledge in a collective bargaining agreement. Otherwise, there will be chaos and confusion in unionized America.

■ This argument has its appeal on paper. However, we find the school of thought more persuasive that union officials should only be held liable for strikes under a common law agency theory, i.e., it must be shown union officials encouraged or ratified the strike in some way before they are held liable for a strike caused by their members. We find something basically repugnant in the assumption or hypothesis behind the mass action theory's logic that a local union should be considered guilty of orchestrating a strike until it proves itself innocent. Such a presumption runs contrary to the American system of jurisprudence which places burdens of proof on moving/accusing parties to find the defendants they have in essence created guilty beyond a reasonable doubt (in criminal cases) and guilty by a preponderance of evidence (in civil cases). If a company who employs union members initiates a complaint in federal court it creates a defendant in the local union. To convict that defendant it should be required to meet the normal standards for conviction recognized in the American legal system. With the mass action theory of liability all the plaintiff/company need do for its case in chief is stand up in front of a judge or jury and say, "The strike occurred." Then plaintiff may sit down and watch defendant union try to exonerate itself.

We find this undesirable and lacking in fundamental fairness. Many unions have extremely large membership rolls and union officials cannot be asked to control various factions within the union at all times under all circumstances. Surely, any union whose members engage in illegal strikes should be required to refute an employer's case in chief that it had a role in encouraging or ratifying the strike. Indeed, we envision that in some cases such a task will be difficult. For example, John Lewis' task of refuting his employer's case in chief that he had a major role in the strike in the case above would appear close to impossible. It seems inescapable that he encouraged or ratified the strike in some material way. However, this did not mean the employer or company accusing him of instigating the strike should not have to prove—even through circumstantial evidence—that he was an orchestrator of the strike. It also does not mean Lewis should be given *no* chance to demonstrate a set of circumstances unbeknownst to the outside world which could prove he had no role in the strike (see caveat in the *United Mine Workers* case in section 1, supra). We deem the common law agency theory of liability more desirable because the employer who does the initial accusing would need to establish the local union officials instigated, supported, ratified or encouraged the strike in some way. Only then would it be up to the union to refute the accusations.

■ Importantly, we emphasize we believe evidence of mass action can be used by the employer in establishing common law agency liability. For example, an employer can argue that under the circumstances of the particular strike at issue before the court, the mere fact that the strike occurred means that the union must have instigated, authorized, or initiated the strike in a material way. Evidence of mass action in imputing local union liability, therefore, is by no means to be considered totally irrelevant in determining if a local union can be held liable for an illegal strike under common law agency principles. However, we believe the better law is to require the accusing party, in this case the employer, to *prove* either by a preponderance of the evidence (or beyond a reasonable doubt when applicable) that the defendant union in some way had a material role in precipitating the strike. The burden of proof in the American legal system is on the accuser, not the accused, and this long-standing principle is hardly accidental.

In declaring the common law agency theory of liability as the means for holding local unions liable for illegal strikes and rejecting the mass action theory as a separate theory of liability, we believe we are following the law set forth in the two most recent Supreme Court cases addressing the subject: *Carbon Fuel v. United Mine Workers*, 444 U.S. 212, 100 S.Ct. 410, 62

L.Ed.2d 394 (1979) and *Complete Auto Transit v. Reis*, 451 U.S. 401, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1980). The Supreme Court in *Carbon Fuel* addressed the issue of whether district or international unions can be held liable for damages to an employer if it did not use all reasonable means to prevent or terminate wildcat strikes. The Fifth Circuit Court of Appeals had held that district and international unions did not have a duty to use all reasonable means to end the strike and could only be found liable for a local's strike under common law agency principles, which required evidence of support, ratification or encouragement to attach liability. However, the Court of Appeals also ruled that *local* unions could be held liable under the mass action theory and that the evidence was sufficient in this case to hold them liable under such agency theory. Unfortunately for our purposes, review of this judgment against the locals was not sought on appeal. Therefore the Supreme Court decision in *Carbon Fuel* technically only concerns liability vis-a-vis district and international unions. Having taken into consideration the fact that the Supreme Court has never specifically spoken on the proper legal theory of liability to be employed in attaching liability to local unions for wildcat strikes, we nonetheless believe from the language in *Carbon Fuel* that the common law agency theory is preferred by the court in attaching liability to locals. Consider the following paragraph written by Justice Brennan:

> ... *the legislative history is clear that Congress limited the responsibility of unions for strikes in breach of contract to cases when the union may be found responsible according to the common-law rule of agency.* Section 301(a) [of the Taft-Hartley Act] makes collective-bargaining agreements judicially enforceable. At the same time, *Congress gave careful attention to the problem* of strikes during the term of a collective-bargaining agreement, *but stopped short of imposing liability upon a union for strikes not authorized, participated in, or ratified by it.* Rather, to effectuate

§ 301(a), the Taft-Hartley Act provided in § 301(b) that a union "shall be bound by the acts of its agents," and in § 301(e) provided that the common law of agency shall govern "in determining whether any person is acting as an 'agent' of another person." In explaining § 301(e) Senator Taft stated, 93 Cong.Rec. 4022 (1947):

> "If the wife of a man who is working at a plant receives a lot of telephone messages, very likely it cannot be proved that they came from the union. There is no case then. There must be legal proof of agency in the case of unions as in the case of corporations...." [Emphasis supplied.] [Citations omitted.] *Id.*, 101 S.Ct. at 413–414.

We believe while the Supreme Court in *Carbon Fuel* did not explicitly denounce the mass action theory of liability with respect to local unions, the language above strongly suggests the common law agency theory of liability is a more desired legal standard in attaching liability in this area. Justice Brennan speaks of unions in general terms in *Carbon Fuel*. If he had found a need to distinguish between international, district and local unions we assume he would have done so. This not being the case we find it inappropriate to make a distinction he never made.

Justice Brennan, who wrote the *Carbon Fuel* decision, also wrote the only subsequent Supreme Court decision to the *Carbon Fuel* case which addresses this issue—*Complete Auto Transit v. Reis*, supra. Once again, Justice Brennan employed language which can only be interpreted as denouncing the use of the mass action theory as a separate theory of liability in holding local unions liable for illegal strikes. *Complete Auto Transit* held an employer may not maintain a suit for damages against individual union members striking on their own volition without union authorization even if their actions violated the no-strike provision of the union's collective bargaining agreement. The question then became if the individual members are not

liable, could the union still be liable for their actions under, in essence, a mass action theory (i.e., because the illegal strike occurred, the union must take blame). In answering this question Justice Brennan stated in the concluding paragraph of the opinion:

> ... the "penumbra" of § 301(b) [of the Taft-Hartley Act], as informed by its legislative history, establishes that Congress meant to exclude individual strikers from damages liability, whether or not they were authorized by their union to strike. The legislative debates and the process of legislative amendment demonstrate that *Congress deliberately chose to allow a damages remedy for breach of the no-strike provision of a collective-bargaining agreement only against unions*, not individuals, and as to unions, only *when they participated in or authorized the strike*. See *Carbon Fuel Co. v. Mine Workers*, 444 U.S. 212, 216, 100 S.Ct. 410, 413, 62 L.Ed.2d 394 (1979). Congress itself balanced the competing advantages and disadvantages inherent in the possible remedies to combat wildcat strikes, and "we are strongly guided by" its choice. [Emphasis supplied.] [Citations omitted.] *Complete Auto Transit*, 101 S.Ct. at 1844–1845.

■ We believe the language above is clear that damage remedies against any union can only be realized if the union participated or authorized the strike of its workers, i.e., according to common law agency principles. We realize other Circuits have ruled differently (see principally, *Eazor Express, Inc. v. The International Brotherhood of Teamsters, Etc.*, 520 F.2d 951 (3rd Cir.1975)). However, we are not the only Circuit to adopt the principles we have laid down in this decision (see principally, *Consolidation Coal v. United Mine Workers*, 725 F.2d 1258, 1263 (10th Cir. 1984)).[1] Considering the spirit of the language above from *Carbon Fuel* and *Complete Auto Transit* we prefer to hold the mass action theory of liability not viable as a separate theory of liability as pertaining to any union at any level in this Circuit.

## III

■ We now turn to the facts of the case *sub judice* and apply the law according to our ruling above. Consolidation Coal Company employed one mobile crane operator for each of its three shifts at the mines. Local 2216 requested an additional (fourth) crane operator be employed during the 8:00 A.M. shift. The company rejected this request and instead offered to switch the crane operator from the midnight shift to the 8:00 A.M. shift. This proposal was deemed unacceptable to the Union and the Union filed a "First Step Grievance" over the matter. Company Superintendent Larry Hawkins rejected the grievance. Union members subsequently met with local officers to complain about the company decision. As a result of this meeting union representatives warned company officials their members were considering a strike.

---

**1.** The Company cites case law from the Third, Fifth and Eighth Circuits which it says endorses the mass action theory as a separate viable theory of liability (see, for example, *Eazor Express*, supra; *United States Steel Corporation v. United Mine Workers of America, et al.*, 534 F.2d 1063 (3rd Cir.1976); *Vulcan Materials Co. v. United Steel Workers of America*, 430 F.2d 446 (5th Cir.1970); *United States Steel Corporation v. United Mine Workers of America*, 519 F.2d 1249 (5th Cir.1975); *Turnkey Constructors, Inc. v. Cement Masons Local 685*, 580 F.2d 798 (5th Cir.1978); *United States Steel Corporation v. United Mine Workers of America, District 20, et al.*, 598 F.2d 363 (5th Cir.1979); and *Wagner Electric Corp. v. Local 1104, International Union of Electrical, Radio and Machine Workers*, 496 F.2d 954 (8th Cir.1974).

The Union cites case law from the Sixth, Seventh, Ninth and Tenth Circuits which it says rejects the mass action theory as a separate viable theory of liability (see, for example, *Davis Co. v. United Furniture Workers of America*, 674 F.2d 557, 564–65 (6th Cir.1982); *Helgesen v. International Association of Bridge, Structural & Ornamental Iron Workers, Local 498*, 548 F.2d 175, 184 (7th Cir.1977); *Old Ben Coal Co. v. Local Union No. 1487, etc.*, 601 F.Supp. 1061 (D.C.Ill.1984); *California Trucking Assoc. v. International Brotherhood of Teamsters*, 679 F.2d 1275, 1287 (9th Cir.1982); *Consolidation Coal Co. v. United Mine Workers of America*, 725 F.2d 1258, 1263 (10th Cir.1984).

Both sides claim in portions of their brief that the Fourth Circuit supports their position.

As a result a "Step Two Grievance Hearing" was proposed. Both sides accepted this alternative and a meeting was scheduled for later that day. Union representatives never appeared at the meeting. The company contacted union president Mark Stanton. Stanton told the company the Union had postponed the meeting until the following morning. That night a strike occurred; no union employees reported for work at the 12:00 midnight shift.

The district court findings of fact state union officials were informed of the work stoppage after its start. The union president responded by calling for a special membership meeting on the afternoon following the beginning of this strike. No union official worked during the dispute. No union officials attempted to lead their members back to work. No telegrams, letters, radio, television or newspaper ads were prepared asking union members to return to work. Disciplinary action against non-working members was apparently not considered.

The special membership meeting was held the afternoon after the strike began. Both the local union president and a union district board member advised the membership to return to the mines. President Stanton noted the Company had the right to realign the crane operator as it had proposed. As a result of the special meeting, the workers decided to return to the mines starting with the 12:00 midnight shift. Union officers called their membership throughout the remainder of the day to inform them the strike was over. In sum, the strike lasted 24 hours in duration and the Company claims $10,000 in damages as a result of the illegal work stoppage.

We believe we must overturn the district court decision for two reasons. First, we are convinced that there is a genuine issue of material fact present in this case which makes summary judgment inappropriate at this point. While the facts of the case have been stipulated to, the intent of union officials behind the facts that have been advanced has hardly been resolved by the record before us. From the record before us it appears the district court made its factual findings from a written set of stipulated facts. Significantly, no witnesses were heard. We agree with the Supreme Court in *U.S. v. Yellow Cab Co.*, 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150 (1949) that, "Findings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses who see and hear them." *Id.*, 70 S.Ct. at 179. In the case before us there are several questions of the intent behind union officials' conduct which are left unresolved and, if further investigated, could conceivably attach liability to the Union along common law agency lines. For example, a "Step Two Grievance Hearing" was scheduled by all parties for a few hours after it was agreed upon. Yet union officials never showed up for the meeting and failed to notify company representatives they would not attend. That very night, coincidentally or not, the strike occurred. We are left wondering what was the motive or reason behind such conduct. Additionally, it is noteworthy that no union official worked during the strike and that no disciplinary measures were invoked by the union leadership. This is peculiar for union leaders who claim they believe the conduct of their "dissenting striking members" illegal and disruptive. We are troubled there is no record of reprimand here. If we are to accept that union officials were not parties to the strike their conduct here appears to minimize the importance of avoiding such illegal strikes in the future. Clearly, more factual development as to the motive and design of local union leaders—preferably from the testimony and/or affidavits of key witnesses—would have been appropriate.

The second reason we believe reversal is proper here is to ensure the legal standards we have enunciated above are applied to this case. The district court ruled the mass action theory not viable as a separate theory of liability. It also ruled the facts did not indicate the union could be held liable under common law agency principles. However, what was not weighed was

whether the evidence of mass action was strong enough to attach common law agency liability to the local union in this case. For example, in *U.S. v. International Union, United Mine Workers of America, supra,* the mass action of President John L. Lewis' union led to the inescapable conclusion he was a party to the ongoing strike. In this sense the mass action of Lewis' rank and file could have led to the finding of Lewis liable under common law agency principles. The decision of the district court leads us to believe it ruled on both theories of liability separately rather than using evidence of the mass action in arriving at its decision along common law agency lines.

Therefore, we vacate and remand the district court decision for further factual findings as to the motive and intent of the union officials' conduct/actions. We further instruct that liability be found according to the legal standards adopted in this decision.

So Ordered.