826 F.2d 1059
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 CONSOLIDATION COAL COMPANY, a corporation, Plaintiff-Appellee,
v.
LOCAL UNION NO. 2322, UNITED MINE WORKERS OF AMERICA,
Defendant-Appellant,
and
International Union, United Mine Workers of America;
District 29, United Mine Workers of America; Link Smith, Box
95, Amonate, VA 24601, individually and as President of
Local 2322; Roger Kinder, Route 5 Box 155, North Tazewell,
VA 24360, individually and as Vice-President of Local 2322;
Larry Brown, Route 1 Box 249C, Cedar Bluff, VA, and as
Secretary-Treasurer of Local 2322, United Mine Workers of
America; Jim Altizer, Route 1 Box 105A, Cedar Bluff, VA,
individually and as Recording Secretary of Local 2322,
United Mine Workers of America; Joe Scarberry, Route 4, Box
638, North Tazewell, VA 24630, individually and as a member
of the Mine Committee of Local 2322, United Mine Workers of
America; Steve Harmond, Box 1074, War, WV 24892,
individually and as a member of the Mine Committee of Local
2322, United Mine Workers of America, Defendant.
 
 No. 86-1709
 United States Court of Appeals, Fourth Circuit.
 Argued July 10, 1987.
Decided Aug. 10, 1987.
 James M. Haviland (Webster J. Arceneaus, III; McIntyre, Haviland & Jordan; Charles F. Donnelly; Crandall & Pyles, on brief), for appellant.
 Charles MacKinley Surber, Jr. (Jackson, Kelly, Holt & O'Farrell; D. L. Fassio, on brief), for appellee.
 Before CHAPMAN, and WILKINS, Circuit Judges, and JOE F. ANDERSON, Jr., United States District Judge for the District of South Carolina, sitting by designation.
 CHAPMAN, Circuit Judge:
 
 
 1
 Consolidation Coal Company (Consol) brought this action pursuant to Sec. 301 of the Labor Management Relations Act of 1947, 24 U.S.C. Sec. 185 (1984), seeking damages for a one-day, unauthorized 'wildcat' strike which occurred on July 31, 1984. The case was tried in the Southern District of West Virginia and the jury returned a verdict for Consol in the amount of $25,000. On appeal, the union argues that the district court erred in submitting the case to the jury on a 'mass action' theory of liability and that the district court abused its discretion in certain discovery and evidentiary rulings. Finding no such error or abuse of discretion, we affirm.
 
 
 2
 * On July 26, 1984, there was a derailment of rail cars at Consol's Amonate Mine. As a result, management decided to remove two bargaining unit employees from their jobs as motormen. The two motormen filed a grievance protesting this action and the matter ultimately proceeded to arbitration. The removal of these motormen, however, triggered the wildcat strike at issue in the instant case.
 
 
 3
 On July 31, 1984, at 8:00 a.m., John Zachwieja, superintendent of the Amonate Mine, received word that employees were engaging in a strike. The morning shift was to begin at that hour and Zachwieja proceeded directly to the waiting room where he found no employees. Zachwieja then encountered the chairman of the mine committee, Joe Scarberry, who told him that the men were not working because they were upset over the removal of the two motormen.
 
 
 4
 Zachwieja proceeded to the bathhouse where he found men changing from their work clothes into their street clothes. Zachwieja told the workers that the removal of the motormen was a safety matter, which had already been submitted to the grievance procedure, and that going on strike over the matter would not benefit the company, the employees or the union. Zachwieja then instructed Scarberry to tell the men to go to work. Scarberry spoke briefly to the employees, stating that he had to tell them to go to work. Other than this statement, Scarberry made no effort to get the men to go to work. Shortly thereafter, all of the men walked out of the bathhouse and did not perform any work that day. Only the crew working at the tipple stayed and worked the day shift.
 
 
 5
 After the bathhouse meeting, the union secretary called the local radio station to announce that there would be a union meeting at 10:00 a.m. The announcement did not instruct the men to return to work nor did it instruct them to work the next scheduled shift. At the 10:00 meeting, the union members decided to send union officers to Zachwieja to advise him that if he reinstated the motormen, the union would return to work. The union also decided to schedule another meeting for 4:00 p.m. Significantly, the second shift was scheduled to start work at 4:00 that afternoon, and thus the afternoon meeting would effectively preclude that shift from reporting to work on time. Again the union secretary arranged for a radio announcement of the 4:00 meeting, but like the previous announcement, it did not urge union members to go back to work.
 
 
 6
 The union officers then went to Zachwieja and explained the union's position on the motormen grievance. Zachwieja told the officers that, due to safety concerns, he could not accept their offer. Zachwieja also expressed his amazement that the union had scheduled a meeting to conflict with the start of the second shift.
 
 
 7
 The union met again at 4:00 p.m. and the officers reported to the membership the substance of their discussions with Zachwieja. At 4:30 p.m. Consol obtained a temporary restraining order barring continuation of the strike. The TRO was served on the union president around midnight but no work was performed by the third shift, which started at that hour. Work resumed at 8:00 a.m. on August 1, 1984.
 
 
 8
 The evidence indicates that no union officer warned the union members, at any of these meetings, that fines or other disciplinary action might be imposed if the union members failed to return to work. It appears that all but one of the union officers refused to work during the course of the strike. Of the 380 bargaining unit employees at the Amonate Mine, 360 refused to work during the strike. The 20 employees that did work were the first shift employees at the tipple. No coal was produced at the Amonate Mine between the hours of 8:00 a.m. July 31, 1984, and 8:00 a.m. August 1, 1984.
 
 
 9
 Consol brought this action in the United States District Court for the Southern District of West Virginia in order to recover the fixed costs which it lost as a result of the strike. During discovery, the district court prohibited the union from discovering certain financial information which the union argued was necessary to its defense. The union wanted its accountant to audit Consol's books for a period of at least a year, it wanted Consol's tax return, and it wanted other information which is not detailed in this appeal with any precision.
 
 
 10
 During the trial, the union attempted, unsuccessfully, to keep Consol from introducing the temporary restraining order. The district court ruled that the TRO was admissible, but when the court admitted the TRO into evidence, it instructed the jury that the jury might consider the TRO as an element in the overall determination of liability but that the TRO, in and of itself, did not establish liability. The district court offered a similarly cautionary instruction in its final charge. The jury returned a verdict for Consol and the union has filed this appeal.
 
 II
 
 11
 The first issue is whether the district court erred in submitting this case to the jury on a 'mass action' theory of liability. In Consolidation Coal v. Local 1702, UMWA, 709 F.2d 882 (4th Cir. 1983), we recognized two theories under which a local union may be held liable for an unlawful strike. The first is the agency theory which is the foundation of the Supreme Court's decision in Carbon Fuel Co. v. UMWA, 444 U.S. 212 (1979). The second is the 'mass action' theory of liability which holds that when the members of a local union act en masse as a union, then liability for their actions may be imputed to the local union.
 
 
 12
 On appeal, the union argues first that our decision in Local 1702 should be overruled in light of two other circuits having considered the mass action theory and rejected it. Consolidation Coal Company v. Local 2216, UMWA, 779 F.2d 1274 (7th Cir. 1985); Consolidation Coal Company v. Local 1261, UMWA, 725 F.2d 1258 (10th Cir. 1984). We remain convinced, that our decision in Local 1702 is correct.
 
 
 13
 Union argues in the alternative, that the facts in the instant case distinguish it from Local 1702 and thus the district court erred in charging the mass action theory. Specifically, in Local 1702, the evidence was clear that all members of the defendant local unions, including their officers, participated in wildcat strikes. In the instant case, 20 union members, including one officer, worked during the wildcat strike. The union argues that the mass action theory of liability is not applicable because the wildcat strike did not include all union members.
 
 
 14
 The district court was correct in rejecting this argument and ruling that whenever all, or substantially all, of the union members participate in a wildcat strike, the mass action theory is applicable. The purpose of a strike is to shut down the employer's production and the presence of a few workers during a strike will not alter the fact that production has been stopped. In the instant case, despite the fact that 20 employees reported for work, the Amonate Mine was shut down. These 20 worked at the tipple and not in the mine. To require that all employees must engage in the wildcat strike before the mass action theory of liability obtains would enable a union to avoid liability by ordering a hand full of its members to report for work without hindering the union's ability to halt production. Thus, we find no error in the district court's submission of this case to the jury on a mass action theory.
 
 
 15
 Under the terms of the collective bargaining agreement, the union was liable to pay Consol for the fixed cost which Consol incurred during the course of the unlawful strike. During discovery the union attempted to audit Consol's books for at least a year and it sought to discover Consol's tax returns in addition to other information. Consol is one of the nation's largest coal producers and the information which the union sought was in no way relevant to the fixed costs which Consol incurred at the Amonate Mine on one day during the summer of 1984. Consol objected strenuously to the union's attempts to discover this information, arguing that the union wanted the information, not for the purposes of this case, but to use during contract negotiations. The district court did not abuse its discretion in denying these discovery requests, because even though the scope of discovery is broad, the information sought must bear some relevance to the case at bar.
 
 
 16
 Finally, the union argues that the district court erred in admitting the TRO into evidence. At trial the union took the position that it had not authorized or organized the strike and that its officers worked diligently to persuade the workers to return to their jobs. It was Consol's theory that if the union officers did not organize and encourage the strike, they certainly did nothing to stop it and that the procurement of the TRO was the only reason the workers returned to their jobs. Thus, introduction of the TRO was necessary to Consol's case. The district court twice cautioned the jury that the TRO itself was not conclusive on the issue of liability, but rather that it was only one of many elements which the jury should consider in deciding that question. Under these circumstances there was no abuse of discretion in admitting the TRO. The decision of the district court is, therefore,
 
 
 17
 AFFIRMED.