### The NEW YORK TIMES COMPANY, Plaintiff,

v.

### NEWSPAPER AND MAIL DELIVERERS' UNION OF NEW YORK AND VICINITY, et al., Defendants.

No. 89 Civ. 6099 (RPP).

United States District Court, S.D. New York.

June 19, 1990.

Reargument Denied Sept. 19, 1990.

---

**15.** Insofar as *Unico* found notice or bad faith simply on the basis of the "close connection" doctrine, I decline to follow it.

Bernard Plum, Joseph Baumgarten, Proskauer Rose Goetz & Mendelsohn, New York City, for plaintiff.

Thomas W. Gleason, Maura R. Cahill, Ernest L. Mathews, Jr., New York City, for defendants.

## OPINION AND ORDER

ROBERT P. PATTERSON, JR., District Judge.

These are motions by the plaintiff for an order holding defendants in contempt, to amend the complaint, and for injunctive relief.

## BACKGROUND

Plaintiff, the New York Times Company (Times), filed this action on September 14, 1989 against the Newspaper and Mail Deliverers' Union of New York and Vicinity (NMDU); Michael Alvino (Alvino), individually and as President of the NMDU; Seymour Goldstein (Goldstein), individually and as Business Agent of the NMDU; John Medica (Medica), individually and as Chapel Chairman (shop steward) of the NMDU; Gary Ericson (Ericson), individually and as Assistant Chapel Chairman of the NMDU; and all others in active concert or participation with them. The complaint sought injunctive relief, damages, costs and attorney's fees, based upon allegations of a pattern of "work slowdowns" in violation of the collective bargaining agreement's "no strike" and arbitration provisions. Un-

der the "no strike" provision, the NMDU is prohibited from engaging in strikes, slowdowns or other forms of work stoppages with respect to disputes subject to the arbitration process, which consists of a hearing before a five-person committee (two labor representatives, two management representatives and the Impartial Arbitrator, Richard Adelman).

Also on September 14, 1989, the Times obtained from this Court a temporary restraining order (a "status quo" order) enjoining defendants from playing a role in either (1) an "interruption in the normal and timely delivery of newspapers ... over any" arbitrable dispute or (2) a refusal to comply with a status quo award issued under the arbitration provisions of the collective bargaining agreement. The Court also signed an order to show cause why a preliminary injunction should not issue embodying the provisions of the TRO. The TRO was to expire on September 19, 1989, the return date of the order to show cause.

On September 18, 1989, pursuant to a stipulation of the parties, the Court extended the effectiveness of the temporary restraining order "until the conclusion of the hearing on plaintiff's application for a preliminary injunction" and adjourned the date of the hearing on the application for a preliminary injunction to October 17, 1989. On October 13, 1989 and on various dates thereafter, the Court, in the light of ongoing labor negotiations between the parties and pursuant to the parties' stipulations, adjourned the date of hearing to March 23, 1990. At that time the Court ruled that, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, a consolidated hearing for a preliminary injunction and trial on the merits would be held on March 28, 1990. On March 27, 1990, the parties requested an adjournment of the hearing and trial which was denied. On March 28, 1990, the parties filed a stipulation and order pursuant to which (i) the Court entered a "status quo" injunction embodying the terms of the TRO; (ii) the request by plaintiff for damages caused by the work stoppages and slowdowns referred to in the complaint was dismissed; (iii) defendants' pending motion to dismiss the complaint was withdrawn with prejudice; (iv) the parties agreed to arbitrate a list of specific grievances within ninety days; and (v) the Court retained jurisdiction to enforce the Injunction.

On March 29, 1990, the plaintiff made application for and obtained another temporary restraining order, as well as an order to show cause why the Court should not (i) hold defendants in contempt of the March 28, 1990 Injunction, (ii) award plaintiff "its actual damages suffered as a result of defendants' contempt (including attorneys fees and costs) and set[ ] coercive fines ... payable to plaintiff in the event that defendants do not purge the contempt"; (iii) permit plaintiff to file an amended complaint, and (iv) issue a preliminary injunction prohibiting any work interruptions and non-compliance with "status quo" awards, but without the limitation contained in the March 28, 1990 Injunction enjoining only those interruptions over disputes "resolvable under the grievance and arbitration provisions of the collective bargaining agreement between the Times and the NMDU." The March 29, 1990 TRO however contained the same provisions as the March 28, 1990 Injunction. A hearing on the order to show cause was set for April 4, 1990 and the TRO was ordered effective through April 4, 1990 "or the conclusion of the hearing, whichever is later." Hearings on plaintiff's motions were conducted on April 4, 5, 9, 10, 11 and 12, 1990. Both parties submitted post-hearing memoranda on or before April 24, 1990.

## DISCUSSION

### I. *Contempt Findings*

The Times seeks an order holding NMDU and the individual defendants, except for Ericson, in contempt for a 50 minute walkout by approximately 80 to 100 members of NMDU at the Times 43rd Street Plant on March 28, 1990. The walkout took place from approximately 9:30 P.M. to 10:20 P.M., barely nine hours after the Court had signed the Injunction. The defendants do not dispute that said walkout occurred, nor do they dispute the authority of the Court to issue the TRO and March 28, 1990 injunction. *See Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). Instead, defendants contend that a finding of contempt is inappropriate because the incident was a "wildcat" action for which the NMDU and its officials bore no responsibility.

█ A union is not automatically liable every time its members go on strike. In this civil contempt proceeding, plaintiff bears the burden of establishing defendants' responsibility for the violation of the injunction by clear and convincing evidence.

*EEOC v. Local 638*, 753 F.2d 1172, 1178 (2d Cir.1985), aff'd sub nom., *Local 28 v. EEOC*, 428 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986); *Black Diamond Coal Mining Co. v. Local Union No. 8460*, 597 F.2d 494, 496 (5th Cir.1979). Plaintiffs must prove defendants liable "under a common law agency theory, i.e., it must be shown union officials encouraged or ratified the strike in some way." *Consolidation Coal Co. v. Local 2216*, 779 F.2d 1274, 1277–79 (7th Cir.1985) (citing *Complete Auto Transit v. Reis*, 451 U.S. 401, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1980) and *Carbon Fuel v. United Mine Workers*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979)). A union's "[r]atification [of a strike] occurs where the union's efforts to return strikers are so minimal that the union's approval or encouragement may be inferred. Liability may be avoided, obviously, by a credible demonstration of union disapproval." *United States Steel Corp. v. United Mine Workers*, 598 F.2d 363, 365 (5th Cir.1979); *see also Consolidation Coal Co. v. Local 1702*, 683 F.2d 827, 831 & n. 5 (4th Cir.1982) (contempt based upon union's failure to "use reasonable efforts to end the strike");[1] *cf. EEOC v. Local 638*, 753 F.2d at 1178 (contempt based upon union's failure to be " 'reasonably diligent and energetic in attempting to accomplish what was ordered' ") (quoting *Powell v. Ward*, 643 F.2d 924, 931 (2d Cir.), cert. denied, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981)).

■ Here the Court holds NMDU and two of its officials in contempt based upon findings that (a) in the weeks preceding the March 28, 1990 walkout, NMDU officials engaged in acts which created an atmosphere that encouraged and incited labor activity in violation of the collective bargaining agreement, such as the one hour work stoppage of March 28, 1990, and that (b) NMDU officials refrained from engaging in authoritative preventive action on March 28, 1990.[2] A review of the practices of the Times's employees and the relations between NMDU and the Times over the past several months is necessary to comprehend the Court's findings.

### A. Union—Employer Tensions Prior to the September 14, 1989 TRO

The Times employees, represented by NMDU, are responsible for loading, driving, and unloading trucks on a variety of newspaper delivery routes in the City and other areas of the Northeast. Their work shift begins at 9:30 p.m. and ends at 4:30 a.m. In the summer of 1989, the Times informed the NMDU that it intended to implement a reorganization of the West Side Direct Routes so that the distribution of newspapers in that area would be more efficient and less costly. The Times believed that it could undertake such a reorganization under Appendix B to the collective bargaining agreement, as long as the number of delivery routes in the West Side operation were not reduced. The Appendix B amendment to the collective bargaining agreement, upon which the Times relied, was reached in 1988 with a prior union management and counsel. The current NMDU management, elected in June 1989, was not in agreement with the Times's understanding that the Times had such a right under the collective bargaining agreement. Consequently, the proposed reorganization of the West Side Direct Routes as well as several other issues developed into the subjects of disputes between the current NMDU management and the Times during the summer of 1989.

The tension between NMDU and the Times soon manifested itself in the form of NMDU resorting to self-help actions over disputes which the collective bargaining agreement required to have been resolved by arbitration. On August 24, 1989, at the Times's Carlstadt, New Jersey printing plant, a conveyor belt was shutdown by defendant Ericson, upon instructions from defendant Medica and Business Agent James Brennie, over a dispute with foreman Ronald McQuade concerning the appropriate number of NMDU members re-

---

1. In *United States Steel Corp. v. United Mine Workers, supra*, and *Consolidation Coal Co. v. Local 1702, supra*, the circuit courts noted that the "mass action" theory was an alternative basis for liability, however, they did not rest their findings of liability on that theory. 683 F.2d at 831 & n. 5; 598 F.2d at 366. This Court also refrains from relying on the "mass action" theory, the viability of which in the Second Circuit is still an open question.

2. To establish contempt and impose sanctions, "[i]t is not necessary to show that defendants disobeyed the district court's orders willfully." *EEOC v. Local 638*, 753 F.2d at 1178 (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949)); *see also Manhattan Industries v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir.1989), cert. denied sub nom., *Banff, Ltd. v. Salant Corp.*, —— U.S. ——, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990).

quired in loading a truck.[3] Workers remained idle for approximately 45 minutes due to the conveyor belt shutdown. Earlier that day, Arbitrator Adelman had issued a status quo order on the dispute in favor of the Times.

On September 5 or 6, 1989, defendant Medica, held a chapel meeting at which he directed NMDU members to "adhere to strict contractual requirements in making their deliveries." Such an instruction calls for workers to depart from usual practices and engage in what is in effect a slowdown from normal operations. The meeting was attended by Union President Alvino and Business Agent Goldstein, who did not contradict Medica's instructions. On the night of September 12, 1989 and the morning of September 13, 1989, some NMDU drivers engaged in a slowdown of newspaper deliveries to suburban and out-of-town wholesale distributors, causing later than usual out-of-town deliveries of papers. Other NMDU members resorted to unloading trucks by departing from the usual practice of utilizing side doors or conveyor belts. The Times immediately applied to Arbitrator Adelman for a status quo order. As a result, on September 13, 1989, Arbitrator Adelman directed the Union "to instruct all the drivers to cease and desist from interfering with normal delivery of runs and to make all deliveries in the usual amount of time, and to utilize all the [truck] doors in making deliveries as they have in the past."

When the slowdown of deliveries continued on the night of September 13, 1989 and six drivers were observed taking a lengthy meal at McDonalds restaurant, near Bridgeport, Connecticut, the Times sought and obtained from this Court a TRO on September 14, 1989. The TRO enjoined the defendants from either (1) engaging in any strike, slowdown, or other form of work stoppage over arbitrable disputes or (2) refusing to obey or comply with any orders issued by the Arbitrator. The NMDU officers communicated the terms of the TRO to the membership and copies of it were posted on the bulletin boards of the Times's plants in Carlstadt, New Jersey and 43rd Street in New York City.

B. *An Unsuccessful Negotiating Period and the Resumption of Union— Employer Tensions*

After the TRO was entered, the Times and NMDU began several months of negotiations over the outstanding grievances, but particularly over the proposed reorganization of the West Side Direct Routes. During this negotiation period there were no slowdowns. Unfortunately, the lengthy negotiations proved unsuccessful. By letter dated January 31, 1990, the Times gave NMDU notice that the reorganization of the West Side Direct Routes would be implemented on March 5, 1990. NMDU then sought a status quo order from the Arbitrator to prevent the implementation of the Time's reorganization plan. On March 2, 1990, the Arbitrator denied NMDU's request, subject to a hearing on the merits.[4]

Foreman McQuade reported that on March 4 and 5, 1990, NMDU drivers on the West Side Direct Routes were engaging in slow motion deliveries. As a result, the Times obtained a status quo order from the Arbitrator on March 7, 1990, requiring the "drivers to perform their functions in a normal manner and in the usual amount of time." Nevertheless, on the West Side Direct Routes the slowdown continued, despite Foreman McQuade's requests to Medica that it be discontinued.

The tension was augmented on March 19, 1990, four days after the hearing on the merits of the proposal to reorganize the West Side Direct Routes, when Medica posted on NMDU's bulletin board a copy of a letter he had received from Business Agent Goldstein, a member of the arbitration panel, informing the Times, "On March 27, 1990 the comeback time will cease." Comeback time, a form of incentive pay, was earned by some NMDU drivers who returned to 43rd Street from the "Bull Dog Run" (the earliest delivery) and suburban runs in time to make a second delivery within the scheduled delivery time for such later deliveries. The elimination of comeback time meant the cessation of a common practice and a slowdown of operations on the earlier run.[5]

On March 23, 1990, the Times responded to the posting of Goldstein's statement by

---

3. Trucks of various sizes require different numbers of workers.

4. The Arbitrator's hearing on the merits of the West Side reorganization was held on March 15, 1990. It is disputed between the parties as to whether the Arbitrator made known his deci-

sion on the merits of the details of the reorganization of the West Side Direct Routes at the hearing.

5. NMDU claims that the elimination of comeback time will aid the pension plan's funding.

sending a letter to NMDU reminding it of the existence of the TRO and informing it that a status quo order on comeback time would be sought from the Arbitrator. On March 26, 1990, a written decision was issued in favor of the Times on the reorganization of the West Side Direct Routes issue. On March 27, 1990, the Arbitrator granted the Times the status quo order it had sought concerning comeback time and declared Mr. Goldstein's letter inoperative. The March 27, 1990 status quo order concluded that if the Union believed any orders from a foreman were subject to the status quo provisions of the collective bargaining agreement, then it should seek a status quo order rather than have members engage "in any self help." This status quo order, which put NMDU officials on notice of the possible need to take action to prevent "self help," was posted on the Times's employees' bulletin board.

Goldstein responded by notifying the Times the next day, March 28, 1990, with copy to Medica for posting, that "as of April 1, 1990 all suburban runs will take the full negotiated running times." This letter was duly posted on NMDU's bulletin board at the 43rd Street Plant by Medica. At 12:30 P.M. on March 28, 1990, the Court signed the Injunction, pursuant to the parties' stipulation, embodying the terms of the September 14, 1989 TRO. At 9:30 P.M., the walk out which is the subject of this motion occurred.[6]

In sum, the evidence is clear and convincing that NMDU officials used their positions to encourage disregard for the arbitration process, thereby engendering an atmosphere such that on the evening March 28, 1990 it was clear that NMDU was not seeking to cause its member to honor this Court's outstanding orders to refrain from striking over an arbitrable dispute. When the slowdowns resumed in early March, NMDU failed to remind the employees that the September 14, 1989 TRO remained in effect. Medica took no steps to discontinue the early March slowdowns when he was informed of these acts which violated the TRO, because he believed that the reorga-

nization "stole time" from NMDU members and would reduce take home pay. In addition, Medica violated the TRO by not heeding the March 7, 1990 status quo order and failing to direct drivers to perform their functions in a normal manner.

Medica also participated with Goldstein in the publication of threats to end comeback time. The Court finds that these threats were sent as a counterattack for the Times's implementing its right to reorganize the West Side Direct Routes and for the Times's expected victory in the arbitration on the merits of the reorganization of the West Side Direct Routes. Goldstein's letters constituted a counterattack and communicated to the workers a disrespect for the arbitration process and contempt for the September 14, 1989 TRO (if any workers were even aware in March 1990 that the September 14, 1989 TRO remained in existence). The letters instigated and encouraged employees represented by NMDU to resort to self-help rather than abide by the arbitration process. The March 28, 1990 letter which disregarded the previous day's status quo order communicated another instruction to ignore the arbitration process. Accordingly, Medica and Goldstein engaged in acts which created an atmosphere that encouraged the March 28, 1990 walkout.

The Court finds additional grounds for contempt based upon the acts of Medica and Goldstein on the evening of March 28, 1990, when the walk out occurred. Medica publicly opposed the walkout before it occurred, but his acts " 'lacked authoritative forcefulness.' " *Consolidation Coal Co. v. Local 1702*, 683 F.2d at 831 (quoting *United States Steel Corp. v. United Mine Workers*, 598 F.2d at 366.). The March 28, 1990 Injunction required NMDU to "take all steps necessary to ... ensure compliance by those [NMDU member] employees with this order, including, but not limited to, the imposition of NMDU discipline." All Medica did was mutter that the workers should not "do anything stupid." He could have threatened fines and other forms of union discipline to isolate those involved. In light of Medica's awareness that the

---

**6.** On March 29, 1990, the Arbitrator issued a clarification of his March 27, 1990 order, in which he made it clear that the instruction in Goldstein's letter of March 28, 1990 that drivers take full running time on suburban runs was inoperative and that those drivers should con-

tinue to resume the same practices they had followed in the past, i.e., some taking comeback time and some not taking it. The Union was "directed, once again, not to order the employees to engage in any self-help."

walkout was going to occur, his act was insufficient and amounts to contempt for the Court's orders.[7] Goldstein exhibited contempt in that he had been delegated responsibility as business agent to ensure compliance with the TRO and Injunction. He failed to notify the members of the Injunction signed earlier on March 28, 1990 or to bring the September 14, 1989 TRO to the attention of the workers during the month of March. Based upon its findings, the Court finds Medica and Goldstein in contempt. NMDU is also held in contempt because Medica and Goldstein engaged in these acts in their capacity as union officials.

The Court does not find any acts of Union President Alvino to have constituted contempt. Alvino testified that he had delegated the responsibility to advise members of the TRO and Injunction to the business agents, and particularly to Goldstein. He also testified without contradiction that he had not opposed Goldstein's March 19 letter on comeback time because he had always opposed comeback time, but that he did tell Goldstein to seek a resolution by arbitration. Alvino was not aware of the March 28, 1990 walkout, and in view of his many other responsibilities and ongoing negotiations, the Court does not find him in contempt of the TRO or Injunction.

## II. *Remedies*

■ Plaintiff seeks compensatory damages, prospective fines, attorney's fees and costs, and an expanded injunction. District courts have "wide discretion in fashioning a remedy" for a contempt violation. *Soobzokov v. CBS, Inc.*, 642 F.2d 28, 31 (2d Cir.1981). However, at a minimum a district courts must "award[ ] damages, to the extent they are established." *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir.1979). In addition, district courts must limit remedies in accordance with the rule that "civil contempt proceedings must be 'remedial and compensatory, and not punitive.'" *Manhattan Industries v. Sweater Bee By Banff, Ltd.*, 885 F.2d at 5 (quoting *Sunbeam Corp v. Golden Rule Appliance Co.*, 252 F.2d 467, 469 (2d Cir.1958)).

■ Plaintiff is entitled to compensation from NMDU for the damages caused by the contemnors on March 28, 1990. The evidence shows that the stoppage caused backups and idled employees in the 43rd Street Plant. However, the printing presses operated at 100 percent efficiency and therefore the Times's additional expenses and losses were limited. Those additional expenses were the cost of two extra chauffeurs, $310; cost of lost circulation of the Bulldog edition, $224; lost papers due to late arrival of Troy/Albany truck, $188; late arrival of the Harrisburg trailer, $100; for a total of $822. The Court does not offset this amount by the savings effected by the Times's decision to deduct an hour's pay from the employees who in some way participated in the work stoppage. The deduction of payments was a disciplinary measure and not an operational offset.

In addition, in order to make plaintiff whole for the damages caused by the contempt, the contemnors must recompense plaintiff for its costs and attorney's fees for having to prosecute the contempt. This is in accordance with the rule set forth by the Second Circuit in *Vuitton et Fils S.A. v. Carousel Handbags, supra:*

> Since the plaintiff should be made whole for the harm he has suffered, it is appropriate for the court also to award the reasonable costs of prosecuting the contempt, including attorney's fees, if the violation of the decree is found to be willful.

592 F.2d at 130 (citing *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664–65 & n. 5 (2d Cir.1970)); *see also Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 39 (2d Cir.1989). The acts of contempt on behalf of NMDU by Medica and Goldstein, as described above, were "intentional ... with at least callous ence for the consequences" and therefore were willful. *See Sizzler Family Steak Houses v. Western Sizzlin Steak House*, 793 F.2d 1529, 1535 (11th Cir.1986) (defining willful contempt). Accordingly, costs and attorney's fees, limited to reasonable fees required to prosecute the contempt, are a proper component of plaintiff's damages.

The Court finds that the compensatory damages outlined above are adequate to

---

**7.** Even if Medica had not yet learned of the March 28, 1990 Injunction, he was aware that the September 14, 1990 TRO remained in effect.

coerce compliance with the Injunction. *See Soobzokov*, 642 F.2d at 31 (when implementing remedies for civil contempt, district court must use discretion "to determine when and if the borderline between coercion and punishment has been reached"). The additional imposition of coercive fines for future failures to comply would not render the Injunction more effective and would pose an unnecessary financial threat to defendants. Accordingly, plaintiff's request for prospective coercive fines is denied. *See In re Grand Jury Witness*, 835 F.2d 437, 442–43 (2d Cir.1987) (citing *United States v. United Mine Workers of America*, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947)), cert. denied sub nom., *Arambulo v. United States*, 485 U.S. 1039, 108 S.Ct. 1602, 99 L.Ed.2d 917 (1988); *see also New York Times Co. v. NMDU*, 517 F.Supp. 662, 666 (S.D.N.Y.1981) ("prospective fines are the exception rather than the rule").

■ Plaintiff also moves in its order to show cause for a new preliminary injunction. In almost all respects the new preliminary injunction sought by plaintiff is identical to the March 28, 1990 Injunction and is therefore unnecessary. The only difference is that the new injunction would enjoin work interruptions over "any grievance, difference or dispute arising out of an interpretation or application of the collective bargaining agreement." Such an injunction has a larger scope than the March 28, 1990 Injunction which only enjoins work interruptions over "any question, difference, dispute, complaint or grievance with The Times *which is resolvable under the grievance and arbitration provisions of the collective bargaining agreement between The Times and the NMDU.*" Injunction at 2, ¶ 1 (March 28, 1990) (emphasis added).

Defendants object, based upon the Supreme Court's holding in *Boys Markets,* to the additional scope of the proposed injunction. In *Boys Markets,* the Supreme Court held that injunctions could be issued, despite the Norris–LaGuardia Act's injunction prohibitions, when there is a strike over an arbitrable grievance in breach of a contractual no strike clause, or when breaches are occurring and are likely to continue and to cause irreparable injury to the employer.

398 U.S. at 254, 90 S.Ct. at 1594. Defendants do not contest that events preceding the March 28, 1990 Injunction constituted sufficient grounds under *Boys Markets* and its progeny, *see U.P.S. v. Local 804,* 698 F.2d 100, 109–111 (2d Cir.1983), for the entrance of the March 28, 1990 Injunction. Indeed, defendants stipulated to the entrance of the March 28, 1990 Injunction rather than contesting plaintiff's allegations at a hearing and trial. The Court finds, however, that there is no basis for plaintiff's request for an expanded injunction, in light of the policy of *Boys Markets* and the standards set forth by its progeny in the Second Circuit.

In *Boys Markets,* the Supreme Court stated:

> Our holding in the present case is a narrow one. We do not undermine the vitality of the Norris–LaGuardia Act. We deal only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure. Nor does it follow from what we have said that injunctive relief is appropriate as a matter of course in every case of a strike over an arbitrable grievance.

398 U.S. at 253–54, 90 S.Ct. at 1594. The Supreme Court permitted labor injunctions in *Boys Markets* only out of deference to "the national policy of encouraging peaceful extrajudicial resolution of disputes." *UPS,* 698 F.2d at 109. An injunction that bars self-help over all disputes, regardless of whether the dispute is one which should have gone to arbitration, would conflict with the Norris–LaGuardia Act's injunction prohibitions without vindicating any national policy favoring resolution by arbitration. Since the requested injunction is not limited to enjoining arbitrable disputes, it is not permissible under *Boys Markets.*

The Court also finds that the plaintiffs have not met their burden of showing that there is an "egregious situation" in which there is a likelihood that the pattern of conduct sought to be enjoined will continue. *UPS,* 698 F.2d at 110–11. In the Stipulation and Order accompanying the March 28, 1990 Injunction, the Court ordered, with the parties' consent, that the Times and NMDU arbitrate within ninety days a list of seventeen grievances, including disputes pertaining to the West Side Direct Routes.[8]

---

**8.** The Court reiterates that in the March 28, 1990 Injunction it ordered that the parties are to observe all awards issued by the arbitrator until such time, if ever, as they are determined to be invalid or as they may become of no force or effect under the terms of the collective bargaining agreement.

Those arbitrable disputes underlay the events of September 1989 and March 1990, as recounted above. In light of the stipulation and order to arbitrate those disputes, as well as the March 28, 1990 Injunction enjoining self-help over arbitrable disputes, there is no need for the additional injunction sought by plaintiff.

Plaintiff also moves to amend its complaint. The amended complaint seeks a permanent injunction identical to the preliminary injunction requested in the March 29, 1990 Order to Show Cause. For the reasons stated above, such an injunction is not warranted. All of the relief sought under the amended complaint is redundant in light of the relief which plaintiff has already sought and obtained through its original complaint and the March 29, 1990 Order to Show Cause. Accordingly, the motion to amend the complaint is denied as futile.

## CONCLUSION

Medica and Goldstein are found in contempt in their capacity as NMDU officials. NMDU is also found in contempt. The contemnors are to recompense the Times for their damages in the sum of $822 plus the costs of prosecuting the contempt, including reasonable attorney's fees. The motions of plaintiff are denied in all other respects.

IT IS SO ORDERED.

## AMENDED OPINION AND ORDER

Defendants move for reargument of the Opinion and Order of June 19, 1990 ("Opinion") in the above captioned case. The motion does not dispute any of the conclusions of the Opinion, but takes issue with the Court's characterization of the scope of the injunction of March 28, 1990, which was signed by the Court on consent of both parties.

The Court stated in the Opinion that the March 28, 1990 injunction applies to all future arbitrable disputes arising under the collective bargaining agreement. Both parties agree that such a characterization of the March 28, 1990 injunction's scope is overbroad, but that it has no bearing on the conclusions of the Opinion.[1] Defendants bring this motion seeking clarification of the exact scope of the March 28, 1990 injunction.

The Court has received memoranda of law from each party as well as a series of five letters clarifying their positions. The letters and memoranda reveal that the parties agree that the March 28, 1990 injunction enjoins any work stoppage over arbitrable disputes in existence on September 14, 1989. The only dispute is over whether the March 28, 1990 injunction enjoins *all* work stoppages concerning the West Side Direct Routes Reorganization or whether the March 28, 1990 injunction only enjoins those work stoppages concerning disputes over the West Side Direct Routes Reorganization which were in existence on September 14, 1989. *See* Pl. Letter of July 27, 1990; Def. Letter of July 30, 1990.

This difference in viewpoints raises an issue of fact. The Court has found that disagreements over the West Side Direct Routes Reorganization commenced prior to September 14, 1989. Opinion at 244. The issue is whether it is possible for a dispute to relate to the West Side Direct Routes and be sufficiently distinct from the pre-September 14, 1989 disputes so that it would be beyond the scope of the March 28, 1990 injunction. Resolution of this issue would require speculation from the Court as to fact patterns which have neither arisen nor been shown to be likely to arise. Accordingly, the dispute between the parties is unripe for adjudication.

The correspondence between the parties also reveals that they dispute the meaning of the March 28, 1990 injunction's requirement that the parties comply with status quo orders. This issue was raised neither in the notice of motion nor in the memoran-

---

1. The Court found that plaintiff was not entitled to a new injunction enjoining all disputes because the scope of the proposed new injunction would duplicate the scope of the March 28, 1990 injunction, which remains in effect, and because there was not an "egregious situation" under *U.P.S. v. Local 804,* 698 F.2d 100, 110–11 (2d Cir.1983). *See* Opinion at 247–249. Even if the scope of the March 28, 1990 injunction is limited to enjoining work stoppages concerning arbitrable disputes in existence on September 14, 1989, as both parties concede in their motion papers that it is, the finding that the prerequisites of *UPS* were not satisfied was sufficient grounds for denial of the new injunction requested by plaintiff in the motion at issue in the Opinion. *See* Opinion at 248.

da of law. More importantly, it is unripe for adjudication because it is based on speculative fact patterns.

Defendants' motion for reargument is denied. However, the Court amends the opinion to reflect that both parties interpret the March 28, 1990 injunction to bar any work stoppage over arbitrable disputes which were in existence on September 14, 1989 and which are arbitrable under the collective bargaining agreement.

IT IS SO ORDERED.