**IMPERIAL CONSTRUCTION MANAGE-MENT CORPORATION, Guy Cleveland, and D.J. Electric, Plaintiffs,**

v.

**LABORERS INTERNATIONAL UNION OF NORTH AMERICA LOCAL 96; International Union of Operating Engineers Local 150; International Brotherhood of Electrical Workers, AFL–CIO, Local 701; DuPage County Building and Construction Trades Council, Defendants.**

**No. 86 C 5715.**

United States District Court, N.D. Illinois, E.D.

Jan. 17, 1990.

defeat a motion for summary judgment.

John J. Toomey, Arnold & Kadjan, and Louis E. Sigman, Baum and Sigman, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

This is an antitrust action brought by Imperial Construction Management Corporation ("Imperial"), Imperial's sole owner Guy Cleveland, and D.J. Electric against Laborers International Union of North America, Local 96 ("Laborers Local 96"), International Union of Operating Engineers, Local 150 ("Engineers Local 150"), International Brotherhood of Electrical Workers, AFL–CIO, Local 701 ("IBEW Local 701"), and the DuPage County Building and Construction Trades Council ("Trades Council"). Pending are (1) defendants' motion for dismissal or summary judgment, which raises issues concerning the labor exemptions from the antitrust laws, and (2) defendants' subsequently-filed motion for judgment on the pleadings, which raises issues of res judicata and collateral estoppel. The parties agree that the second motion should be disposed of before the first motion is considered. For the reasons described below, the Court denies both motions.

### II. FACTS [1]

#### A. *Facts Relating to Imperial*

At the times relevant to this action, Imperial was engaged in managing the construction of a Travel Lodge Motel complex pursuant to a contract with the Carol Stream Motel Associates. The construction site was in Carol Stream, in DuPage County, Illinois. Defendants engaged in a series of picketing actions at the site, as follows:

(a) From about October 5 through October 12 and October 18 through October 25, 1984, pickets were placed indicating

Gerard C. Smetana, Abramson & Fox, Chicago, Ill., and Michael Avakian, Center on National Labor Policy, North Springfield, Va., for plaintiffs.

---

1. For purposes of their motion, defendants accept as true the allegations in the Third Amended Complaint ("the complaint") except where defendants claim that the allegations are not adequately pled. The facts described herein are taken from the complaint except where otherwise indicated.

that Laborers Local 96 had a labor dispute with B & A Sewer and Excavating Company ("B & A Sewer"), a non-union subcontractor which was performing work at the site;

(b) On November 12, 1984, pickets were placed falsely indicating that Laborers Local 96 was on strike against B & A Sewer;

(c) From December 4 through December 6, 1984, pickets were placed falsely indicating that Laborers Local 96 had a dispute with Imperial regarding area wage standards;

(d) From about December 10 through December 23, 1984, pickets were placed falsely indicating that Laborers Local 96 had a dispute with General Mechanical Contractors ("General"), a non-union contractor, regarding area wage standards (the Complaint does not specify the role of General at the site);

(e) From December 23, 1984, through January 11, 1985, pickets were placed falsely indicating that Laborers Local 96 had an area standards labor dispute with Imperial;

(f) From January 14 through March 26, 1985, pickets were placed falsely indicating that IBEW Local 701 was on strike against "the electrical contractor," and, later, against Rob Roy Electrical Company, a non-union contractor.

In addition to this picketing, defendants allegedly threatened numerous suppliers that their businesses would be damaged if they crossed picket lines at the site. They also told the president of one subcontractor that he must sign a union contract if he wanted to work in DuPage County. They threatened General with economic reprisals because it did not have a contract with Laborers Local 96. (Paragraph 19(b) of the Complaint alleges that it "did have" such a contract; the Court assumes this is a typographical error and that it did not have a contract.) They threatened individual crane operators that they would be denied future work if they crossed picket lines. They threatened Imperial and General that the site would be shut down if they did not sign a union contract and accede to other union demands. (The Complaint does not specify what type of union contract, or what other union demands, were at issue.) They threatened one of the owners of the construction project that the project would be harmed if he did not get rid of non-union contractors, including Imperial.

On March 25, 1985, as a result of these activities, defendants succeeded in obtaining an agreement signed by Cleveland, on behalf of Imperial, and by Jerry O'Conner, President of the Council. The agreement provides, in its entirety:

> To Whom it May Concern:
>
> In return for the removal of all present and future pickers [sic: picketers] from the immediate area of the Stratford Inn, Carol Stream, Illinois, I, Guy Cleveland, agree to use only labor that is covered by a signed agreement with an AFL–CIO affiliated Local Union on all future building projects in DuPage County, Illinois. The buildings now in place, this date, will be completed with any labor Mr. Guy Cleveland, of the Imperial Construction Company desires.

Upon the signing of this agreement, the picketing ceased.

## B. Facts Relating to D.J. Electric

At the times relevant to the complaint, D.J. Electric was a non-union subcontractor involved in electrical work at various job sites in DuPage County. One of the projects on which D.J. Electric was working was the Hill Top home construction site, where it worked for the general contractor Callaghan Construction ("Callaghan"). Another general contractor, O'Brien, was involved at the same site but employed only union subcontractors.

From about May 6, 1985, periodically through February 7, 1986, IBEW Local 701 picketed D.J. Electric at various job sites, falsely claiming that D.J. Electric did not pay area standard wages. On October 6, 1986, IBEW Local 701 began picketing at the Hill Top site, allegedly with the purpose of persuading Callaghan to cease working with non-union subcontractors. Trades people did not cross the picket lines to work on Callaghan homes, but they did

work on O'Brien homes. The pickets were resumed on November 3, 1986, claiming that D.J. Electric was a non-union subcontractor. The pickets continued even at times that D.J. Electric was not working on the site. On November 6, 1986, agents of IBEW Local 701 told Callaghan that they would remove the pickets if Callaghan would agree to use only union subcontractors. On November 18, 1986, IBEW Local 701 began distributing handbills falsely claiming that Callaghan homes constructed with D.J. Electric workers were unsafe because the work was performed by untrained people.

### C. *Facts Relating to Gasaway*

David A. Gasaway was a non-union contractor. In 1980, Gasaway was doing business as Suburban Sealing Company. On June 13, 1980, agents of Operating Engineers Local 150 and other unions told Gasaway that he could not do business without using union people, and that his job would be shut down unless he cooperated. Agents of the Trades Council picketed banks for which Gasaway was performing work in order to secure agreements to cease doing business with Gasaway. Gasaway had no employees who worked in the jurisdiction of the Operating Engineers, but he was coerced into making payments to Operating Engineers Local 150 and other Trades Council unions for the privilege of operating his own equipment. Trades Council members also attempted to force Gasaway into signing a union pre-hire agreement, which he refused to do. (Plaintiffs include these allegations in their complaint not as an independent basis of relief, but as additional evidence corroborating their allegations relating to Imperial and D.J. Electric.)[2]

### D. *History of the Litigation*

On March 23, 1985, Imperial brought suit against Laborers Local 96, Engineers Local 150, IBEW Local 701, and (by a later amendment to the Complaint) the Trades Council, alleging claims arising under § 303(a) and (b) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 187, via the secondary boycott provisions of the Act, 29 U.S.C. § 158(b)(4). That case *("Imperial I")* was given the number 85 C 2390, and it was assigned to Judge Hart and later reassigned to Judge Alesia.

On December 16, 1985, D.J. Electric filed suit against IBEW Local 701 alleging similar secondary boycott claims under § 8(b)(4) and § 303 of the Act. That case *("D.J. Electric")* was given the number 85 C 10421, and it was assigned to Judge Getzendanner and later reassigned to Judge Moran.

On April 14, 1986, Imperial sought to amend its complaint in *Imperial I* so as to add antitrust claims. Judge Hart denied Imperial's motion, ruling that Imperial had failed to establish an excuse for its 13–month delay in adding the claim and that allowing the amendment when discovery was about to close in the case would prejudice the defendant. (Mem. Opinion and Order, May 28, 1986.)

On August 1, 1986, Imperial and its owner, Guy Cleveland, filed the instant action *("Imperial II")* against the *Imperial I* defendants and several other labor union defendants (later dismissed from the case), asserting antitrust violations. The complaint in *Imperial II* was amended on December 22, 1986, to add D.J. Electric as a plaintiff.

On January 14, 1987, the *Imperial II* plaintiffs requested this Court to consolidate *Imperial I* and *Imperial II* for trial, arguing that the cases involved the same parties, the same or similar fact patterns, and common questions of fact and law. The Court denied the motion because Local Rule 2.31(c) provides that such a motion

---

**2.** Defendants seek to have the allegations relating to Gasaway stricken from the complaint because they occurred prior to the limitations period. The Court rejects this request because pre-limitations evidence may be relevant to plaintiffs' proof of an antitrust conspiracy. *See United States v. United States Gypsum Co.,* 600

F.2d 414, 417–18 (3d Cir.), *cert. denied,* 444 U.S. 884, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979). Defendants also argue that the allegations concerning Imperial are unrelated to the allegations concerning D.J. Electric. This is a question of fact; it is not a ground for dismissing the complaint.

shall be brought before the judge with the lowest numbered case.

On January 8, 1987, D.J. Electric moved to amend the complaint in *D.J. Electric* to add antitrust claims. On May 22, 1987, Judge Getzendanner denied the motion, finding no excuse for D.J. Electric's delay in adding the claims and substantial prejudice to the defendant if the amendment were allowed. (Mem. Opinion and Order, May 22, 1987.)

On April 18, 1988, the defendants in *Imperial II* moved for dismissal or summary judgment on the ground that plaintiffs failed to state a claim upon which relief could be granted. That motion was fully briefed on August 5, 1988, and was subsequently supplemented by additional filings.

On October 7, 1988, the *Imperial II* plaintiffs moved to use the *Imperial I* discovery materials in connection with *Imperial II*. Plaintiffs again emphasized that the two lawsuits shared the same core of operative facts. The Court denied this motion, stating that the use in this case of discovery obtained in other cases would simply be governed by the rules of evidence.

On December 8, 1988, Judge Alesia set *Imperial I* for trial on January 17, 1989. On January 13, 1989, Judge Alesia issued a ruling granting various motions in limine filed by defendants. Imperial then sought to dismiss *Imperial I* without prejudice. Judge Alesia denied that motion. On January 17, 1989, in exchange for the defendants' agreement not to seek sanctions pursuant to Fed.R.Civ.P. 11, Imperial dismissed *Imperial I* with prejudice.

On February 2, 1989, the defendants in *Imperial II* moved for judgment on the pleadings on the ground of res judicata. The parties agreed that the Court should decide this motion before reaching defendants' motion for dismissal or summary judgment.

On February 24, 1989, judgment for $3,000 plus costs was entered in favor of D.J. Electric in *D.J. Electric* pursuant to an offer of judgment by D.J. Electric.[3] After the judgment, new disputes began, as described by Judge Moran:

> Defendant wants to unravel the whole thing because it thought, or at least hoped, that the settlement here would end a case before Judge Rovner, and plaintiff doesn't see it that way. Defendant contends that there was no agreement because there was no meeting of the minds. But the offer was not so qualified. It was an unambiguous offer to settle this action, and defendant is bound by the unqualified acceptance.
>
> That does not mean that the judgment here does not terminate any claims which plaintiff and its privies could have brought against defendant and its privies, whether those claims are currently pending before Judge Rovner or are hereafter brought in state court in DuPage County or anywhere else. The restrictions on starting somewhere else under the guise of a different theory are well established in the law. But the place for defendant to complain that plaintiff is seeking to start again is where defendant believes plaintiff is seeking to do so, using there this judgment as the reason plaintiff cannot proceed.

(Mem. Opinion and Order, Feb. 24, 1989.) Defendants rely on the judgment in *D.J. Electric* as a further ground for application of res judicata here.

### III. MOTION FOR JUDGMENT ON THE PLEADINGS

#### A. *Res Judicata*

■ The doctrine of res judicata, or claim preclusion, prevents a party from splitting claims by bringing two separate suits for essentially the same wrong. It applies where there is "(1) a final judgment on the merits in an earlier action; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or their privies in the two

---

**3.** The Court is aware that an "offer of judgment" is, strictly speaking, an offer by a defendant. See Fed.R.Civ.P. 68. However, the parties and the Court in *D.J. Electric* referred to a settlement offer made by the plaintiff as an offer of judgment.

suits." *Spiegel v. Continental Illinois National Bank,* 790 F.2d 638, 645 (7th Cir.1986) (citations omitted), *cert. denied,* 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986).

The res judicata dispute in this case involves two primary issues: whether the cases arise from the same core of operative facts, thus establishing an identity of causes of action, *see Matter of Energy Cooperative, Inc.,* 814 F.2d 1226, 1230 (7th Cir.1987), *cert. denied,* 484 U.S. 928, 108 S.Ct. 294, 98 L.Ed.2d 254 (1987); and whether, assuming that plaintiffs have otherwise improperly split their claims, defendants have acquiesced in plaintiffs' conduct. Because the Court concludes that defendants have acquiesced, the Court does not reach the issue of whether res judicata would otherwise apply.

Section 26(1)(a) of the Restatement (2d) of Judgments (1982) provides:

(1) When any of the following circumstances exists, the general rule of § 24 [against splitting of claims] does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant:

(a) The parties have agreed in terms or in effect that the plaintiff may split his claim, or the defendant has acquiesced therein; ....

Comment a to § 26(1) of the Restatement elaborates on the meaning of acquiescence:

Where the plaintiff is simultaneously maintaining separate actions based upon parts of the same claim, and in neither action does the defendant make the objection that another action is pending based on the same claim, judgment in one of the actions does not preclude the plaintiff from proceeding and obtaining judgment in the other action. The failure of the defendant to object to the splitting of the plaintiff's claim is effective as an acquiescence in the splitting of the claim. See Illustration 1.

Illustration:

1. After a collision in which A suffers personal injuries and property damage, A commences in the same jurisdiction one action for his personal injuries and another for the property damage against B. B does not make known in either action his objection (usually called "other action pending") to A's maintaining two actions on parts of the same claim. After judgment for A for the personal injuries, B requests dismissal of the action for property damage on the ground of merger. Dismissal should be refused as B consented in effect to the splitting of the claim.

■ The first issue is whether this section of the Restatement accurately states the law to be applied by this Court. Because the issue here is the preclusive effect of a prior judgment entered by a federal court, defendants' motion is governed by federal law. *Energy Cooperative, supra,* 814 F.2d at 1230. Although the Seventh Circuit has not specifically ruled on the applicability of § 26(1)(a), it has applied § 26(1)(b), which provides an exception to the general prohibition of claim splitting where "the court in the first action has expressly reserved the plaintiff's right to maintain the second action." *See Torres v. Rebarchak,* 814 F.2d 1219 (7th Cir.1987). Other federal courts have specifically relied on § 26(1)(a). *See Kern Oil & Refining Co. v. Tenneco Oil Co.,* 840 F.2d 730, 735 (9th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988); *Calderon Rosado v. General Electric Circuit Breakers, Inc.,* 805 F.2d 1085, 1087 (1st Cir.1986); *Kendall v. Avon Products, Inc.,* 711 F.Supp. 1178, 1182 (S.D.N.Y.1989); *Disher v. Information Resources,* 691 F.Supp. 75, 83 (N.D.Ill.1988), *aff'd,* 873 F.2d 136 (7th Cir.1989). The Court has found no case rejecting the use of § 26(1)(a). Furthermore, § 26(1)(a) serves "the policies underlying the doctrine of res judicata—protection of the defendant from harassment and the promotion of judicial economy." *Torres,* 814 F.2d at 1226. As stated in *Kendall,* "[i]f the purpose of the res judicata doctrine is to provide finality in the resolution of disputes and to protect defendants from being vexed by multiple suits, 'it stands to reason that acquiescence by the defendant will work a waiver.'"

711 F.2d at 1182 (citation omitted). The Court concludes that the acquiescence rule of § 26(1)(a) is an accurate statement of the law in this jurisdiction.

The next issue is whether defendants' conduct in this case constitutes acquiescence. Plaintiffs argue that defendants never raised the defense of res judicata in this case until defendants filed their motion for judgment on the pleadings—after judgment had already been entered in *Imperial I* and some two and one-half years after *Imperial II* was filed.

Defendants make several arguments in response, none of which the Court finds convincing. First, defendants argue that it is plaintiffs, not defendants, who are guilty of waiver—by dismissing *Imperial I* and *D.J. Electric* with prejudice rather than having the courts expressly reserve the right to maintain the antitrust claims. Clearly, such a reservation of rights would have been effective to prevent the application of res judicata. *See Torres*, 814 F.2d at 1223–26; Restatement at § 26(1)(b). However, as the Restatement makes clear, such a reservation is not the only exception to the rule against claim splitting. The fact that a reservation of rights was not effected does not preclude application of another exception.

■ Second, defendants argue that they have never acquiesced but rather have consistently opposed plaintiffs' efforts to litigate the antitrust claims. As support for this position, defendants cite their opposition to plaintiffs' efforts to amend the § 303 cases to include the antitrust claims, their opposition to plaintiffs' motions to consolidate the § 303 cases with *Imperial II*, and their motion to dismiss *Imperial II* for failure to state a claim. This argument misses the point. The doctrine of acquiescence does not state that a res judicata defense is waived by a failure to zealously litigate the case. Rather, acquiescence occurs where a defendant does not timely object to the splitting of the claim itself. In this case, defendants never argued that *Imperial I* should not go forward on the ground that it constituted impermissible claim splitting until after judgment was entered in *Imperial I*.[4]

■ Third, defendants argue that their opposition to plaintiffs' motions to litigate all the claims in the same case does not constitute acquiescence or waiver, citing *Petromanagement Corp. v. Acme–Thomas Joint Venture*, 835 F.2d 1329, 1334–35 (10th Cir.1988). Although the Court agrees with this statement, it does not help defendants, because defendants' acquiescence is based not on defendants' opposition to consolidation but on defendants' failure to timely assert a res judicata defense.[5]

**4.** Defendants have not argued that the reason they did not raise their claim-splitting objection earlier was that the lack of a final judgment made them unable to do so. On the contrary, defendants argued in their opening brief that the lack of a final judgment in *D.J. Electric* did not prevent application of the prohibition against claim-splitting. In *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir.1977), the court stated:

[I]t is clear that [the plaintiff] had no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant. *United States v. Haytain Republic*, 154 U.S. 118, 123–23, 14 S.Ct. 992 [993], 38 L.Ed. 930 (1894); *Sutcliffe Storage & Warehouse Co. v. United States*, 162 F.2d 849, 851, 125 Ct.Cl. 297 (1st Cir.1947) (Clark, J., sitting by designation); 1A J. Moore, Federal Practice ¶ 0.219 at 2601 (2d ed. 1974); P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 1232–33 (2d ed. 1973).

When the district court became aware that the two actions begun by [the plaintiff] were virtually identical, it could have dismissed her second complaint without prejudice or it could have stayed proceedings in the second action until judgment was entered in the first. *See also Oxbow Energy, Inc. v. Koch Industries, Inc.*, 686 F.Supp. 278 (D.Kan.1988) (dismissing second action where similar first action was pending).

**5.** *Petromanagement* provides as much support for plaintiffs as it does for defendants, for it also holds that a plaintiff's efforts to consolidate the cases do not estop it from denying the application of res judicata. 835 F.2d at 1334. The procedural history in *Petromanagement* is very similar to the history of this case. The court in *Petromanagement* held that res judicata did apply to preclude plaintiff from prosecuting the second action. That decision is unhelpful here, however, because the plaintiff apparently did not raise, and the court did not address, the

■ Finally, defendants argue that they have consistently made plaintiffs' counsel aware that they would assert a favorable result in the § 303 cases as res judicata in the antitrust case. This awareness, if true, is irrelevant. It is the judicial forum in which defenses must be raised if defendants wish them to be recognized by the Court, and defendants never made the Court aware of an intent to use the § 303 cases to support a res judicata argument in the antitrust case. Indeed, defendants specifically told the Court:

> We are taking a hard line on this. [Plaintiffs' attorney] has filed three different cases. He sought to prosecute it in this fashion. And we will, and the courts say that is how we are going to do it.

(Transcript of Proceedings, October 4, 1988, at 7.)

The conclusion that defendants have acquiesced is not only doctrinally proper; it is the only fair result under the circumstances. If defendants had raised the res judicata defense immediately upon the filing of *Imperial II*, and if the defense had succeeded, the parties may not have needed to expend their resources briefing motions for dismissal or summary judgment on the merits of the antitrust claim. More importantly, if defendants had raised the res judicata defense in *Imperial II* during the two and one-half years after the filing of *Imperial II*, plaintiffs may not have agreed to the dismissals with prejudice of *Imperial I* and *D.J. Electric*. Similarly, plaintiffs may have had incentive to appeal the deci-

sions in *Imperial I* and *D.J. Electric* denying their motions to amend the complaint.

The Court finds that defendants have acquiesced in any claim splitting in which plaintiffs have engaged, and that they may not therefore assert the judgments in *Imperial I* and *D.J. Electric* as res judicata.[6]

### B. *Collateral Estoppel*

■ Defendants argue alternatively that the judgments in *D.J. Electric* and *Imperial I* collaterally estop plaintiffs from relitigating the amounts of any damages they have suffered. Collateral estoppel applies to preclude relitigation of an issue where four requirements are met:

> (1) The party against whom collateral estoppel is asserted must have been fully represented in the prior litigation; (2) the issue sought to be precluded must be identical to an issue involved in the prior litigation; (3) the issue must have been actually litigated and decided on the merits in the prior litigation; and (4) the resolution of that issue must have been necessary to the court's judgment.

*Gray v. Lacke,* 885 F.2d 399, 406 (7th Cir. 1989). The Court finds that the third requirement is not satisfied in this case, and it thus does not reach the other three requirements. Because the *Imperial I* and *D.J. Electric* cases were dismissed upon a voluntary dismissal and a settlement, the issue of the amount of damages suffered by plaintiffs was not actually litigated in those cases. Issues which were not contested in the prior proceeding cannot serve as a basis for collateral estoppel. *See United States v. Young,* 804 F.2d 116, 117–

---

issue of acquiescence arising from failure to timely raise the res judicata defense.

**6.** *Accord, Kern Oil, supra,* 840 F.2d 730, 734, 735 (9th Cir.1988); *Calderon, supra,* 805 F.2d at 1087; *Kendall, supra,* 711 F.Supp. at 1181–82.

Defendants' failure to raise the res judicata defense in their motion to dismiss or for summary judgment, at the latest, may also constitute a waiver under Fed.R.Civ.P. 8(c). Rule 8(c) provides that res judicata is an affirmative defense which must be set forth in pleading to the complaint. It has thus been held that failure to assert res judicata as an affirmative defense constitutes a waiver. *See Kern Oil,* 840 F.2d at 735; *Evans v. Syracuse City School Dist.,* 704

F.2d 44, 48 (2d Cir.1983) (failure to attempt to amend answer to include res judicata defense for two years and nine months after defense became available constituted waiver). *See also* Rule 12(g) (generally, "[i]f a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted"). However, because plaintiff has not asserted waiver under Rule 8(c), and because the Court finds that defendant has acquiesced under common law principles, the Court does not reach this issue.

18 (8th Cir.1986), *cert. denied,* 482 U.S. 913, 107 S.Ct. 3184, 96 L.Ed.2d 673 (1987); *De la Fuenta v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 233–34 (7th Cir.1983); *Long v. Trans World Airlines, Inc.,* 704 F.Supp. 847, 857 (N.D.Ill.1989). The Court accordingly finds that litigation of the damages issues is not foreclosed by collateral estoppel.

## C. *Sanctions*

Defendants seek sanctions in connection with their motion for judgment on the pleadings, contending that plaintiffs' institution of *Imperial II* is bad faith claim-splitting and that plaintiffs' position is meritless. Because the Court rules in favor of plaintiffs on the motion for judgment on the pleadings, defendants' request for sanctions is denied.

## IV. MOTION FOR DISMISSAL OR SUMMARY JUDGMENT

Plaintiffs' antitrust complaint contains three counts. Count I alleges that defendants[7] have engaged in combinations and conspiracies with non-labor entities with the object of monopolizing the construction industry in DuPage County by forcing non-union contractors to either drop out of the market or agree to subcontract only to union firms. Count II alleges that defendants have engaged in picketing and threats in order to coerce agreements violative of § 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e), in order to benefit union contractors. Count III alleges that defendants engaged in picketing and threats to coerce agreements violative of § 8(e) and have engaged in combinations and conspiracies with Imperial and Cleveland and other management groups in order to monopolize the DuPage County construction industry. Defendants' challenge to these allegations is based primarily on the labor exemptions to the antitrust laws.[8]

## A. *The Statutory Exemption*

Defendants first argue that their alleged conduct falls within the statutory exemption to the antitrust laws. This exemption is based on §§ 6 and 20 of the Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52, and the Norris–LaGuardia Act, 29 U.S.C. §§ 104, 105, and 113. *See Mid–America Regional Bargaining Ass'n v. Will County Carpenters Dist. Council,* 675 F.2d 881, 884–85 (7th Cir.) ("MARBA"), *cert. denied,* 459 U.S. 860, 103 S.Ct. 132, 74 L.Ed.2d 114 (1982). "These statutes declare that labor unions are not combinations or conspiracies in restraint of trade, and exempt specific union activities, including secondary picketing and boycotts, from

**7.** Although the Court uses the term "defendants" to describe the actors who allegedly performed the acts complained of (in order to be consistent with plaintiffs' complaint), it is not generally clear which defendants performed which acts. Indeed, the complaint states with typical vagueness: "The Trades Council is alleged to be a defendant in its individual capacity as an organization and collectively as a group of member Local Unions each of whom is alleged to have committed the acts, individually, severally and as agent for each other, as set forth throughout this complaint." (Complaint ¶ 9.) Defendants argue that this "attempt to impute responsibility for the Local 96 and 701 picketing actions by mere membership in the Building Trades Council ... is a mutated version of the 'mass action theory' of liability, expressly rejected by the Seventh Circuit Court of Appeals. *Consolidation Coal Co. v. Local 2216 UMW,* 779 F.2d 1274 (1985)." (Mem. at 6 n. 7.) It is not clear that plaintiffs are relying on the "mass action" theory, which arose in the context of the liability of local unions or union officials for strikes rather than the liability of a trades council for the

actions of its member unions. However, even if plaintiffs are relying on a "mass action theory," the Seventh Circuit did not reject that theory—it merely rejected the notion of presumed agency. The court recognized that "mass action can be used ... in establishing common law agency liability," but it stated that it must be proven that the defendant union "had a material role in precipitating the strike," i.e., "it must be shown union officials encouraged or ratified the strike in some way before they are held liable for a strike caused by their members." 779 F.2d at 1277. Here, plaintiffs have alleged that each defendant participated in every act complained of, either itself or through principles of agency. (If plaintiffs intend otherwise, they should once again amend their complaint.) Although this may be difficult to prove, plaintiffs are entitled to make such an allegation assuming they have paid heed to Fed.R.Civ.P. 11.

**8.** For the most part, the parties do not distinguish between the three counts in presenting their arguments. Accordingly, the Court will not do so either.

the operation of the antitrust laws." *Connell Const. Co. v. Plumbers and Steamfitters Local Union No. 100,* 421 U.S. 616, 621–22, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975). They do not, however, operate to exempt combinations or conspiracies between labor unions and non-labor entities. *Id.* To allege conduct that is not protected by the statutory exemption, plaintiffs must (1) properly plead a conspiracy between the unions and a non-labor entity, or (2) allege conduct that is not in the unions' own self-interest. *See MARBA,* 675 F.2d at 886. *See also Allied Int'l, Inc. v. Int'l Longshoreman's Ass'n,* 640 F.2d 1368, 1379 (1st Cir.1981), *aff'd,* 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982).

### 1. Conspiracy with Non–Labor Entities

Defendants first argue that plaintiffs have failed to properly plead a conspiracy with non-labor entities. Plaintiffs' response on this issue is not always clear. Their brief focuses on the legitimacy of the unions' conduct rather than on the existence of a conspiracy, and they emphasize that proof of a conspiracy with a non-labor entity is not in itself essential in order to avoid application of the statutory exemption. (Resp. at 14 n. 12.) However, in their complaint they state that "defendants have engaged in unlawful combinations and conspiracies with non-labor management groups." (Complaint ¶ 26.) Furthermore, in the context of their argument that defendants' conduct is not in their legitimate self-interest, plaintiffs argue that defendants entered into agreements with contractors requiring contractors to utilize only union subcontractors (referred to below as "union subcontractor agreements")

and that defendants took action to force contractors to enter into such agreements. (Resp. at 15.)

In support of a finding of a conspiracy with non-labor entities, plaintiffs appear to rely on the union subcontractor agreements with contractors.[9] Plaintiffs cite *Altemose Const. Co. v. Building & Const. Trades Council of Philadelphia,* 751 F.2d 653, 659 (3d Cir.1985), *cert. denied,* 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986), where the court found the statutory exemption inapplicable because "the Council did not act unilaterally when it obtained hundreds of agreements from contractors the intent and effect of which was to exclude non-union contractors from the market." However, the Seventh Circuit in *MARBA* made it clear that collective bargaining agreements can only be used as evidence of conspiracy to avoid the statutory exemption in very limited circumstances, if at all,[10] citing *UMW v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). These limited circumstances exist where five elements are alleged: "(1) that the union ... agreed to impose upon other employers terms agreed to by it and a 'non-labor' entity; (2) that the union activity ... [is not] unilateral; (3) that the union activity ... [is] at the behest of or (4) in combination with, a non-labor entity which occupies such a position in the competitive structure that it would *directly benefit* from the restraint; and (5) that the union and non-labor groups share an anticompetitive concerted purpose." *MARBA,* 675 F.2d at 888–89 (emphasis in original). Defendants primarily argue, and the Court agrees, that there is no allegation of a

---

9. For example, plaintiffs argue that the master collective bargaining agreement of the Engineers Local 150 contains the following provision: "The Employer agrees that he will not contract or sub-contract any work covered by the Scope of Work of this Agreement and/or work coming under the Occupational Jurisdiction of the Union to be done at the site of construction, alteration, painting, or repair of a building, structure, or other work, except to a person, firm or corporation, party to the applicable current labor agreement with the Union." (Resp. at 15 n. 14.)

10. *MARBA* can be read as holding simply that collective bargaining agreements concerning subjects of mandatory bargaining are insufficient to remove the statutory exemption without even reaching the five-part inquiry described below. The court did not expressly adopt the five-part inquiry, but rather stated that some courts have used it. 675 F.2d at 886–88. *See also Suburban Tile Center, Inc. v. Rockford Bldg. and Const. Trades Council,* 354 F.2d 1, 3 (7th Cir.1965) ("A construction subcontracting agreement has been held to be a mandatory subject of collective bargaining."), *cert. denied,* 384 U.S. 960, 86 S.Ct. 1585, 16 L.Ed.2d 673 (1966).

direct benefit to a non-labor entity. The only apparent benefit to union contractors of requiring that other contractors sign union subcontracting agreements would be the elimination of competition based on labor costs. Such benefit was held in *MARBA* not to constitute the type of direct benefit to non-labor entities necessary to plead a conspiracy which would render the statutory exemption inapplicable. 675 F.2d at 889.

█ Furthermore, plaintiffs have failed to meet the basic pleading requirements for alleging a conspiracy with the union contractors. When alleging a conspiracy, conclusory allegations do not suffice:

A complaint which merely implies, with the conclusory allegation of a conspiracy, that a defendant is responsible for someone else's fraudulent acts is insufficient. Any plaintiff alleging conspiracy must identify the nature of the conspiracy and the defendant's role in it with some particularity. Above all, since conspiracy rests on agreement, the plaintiff must allege with some particularity facts sufficient to show an agreement between the parties to inflict the alleged wrong.

*Frymire v. Peat, Marwick, Mitchell & Co.*, 657 F.Supp. 889, 895–96 (N.D.Ill.1987) (citations omitted). "A general allegation of conspiracy ... without a statement of the facts constituting the conspiracy, is a mere allegation of a legal conclusion and is inadequate of itself to state a cause of action. The pleader must allege the facts constituting the conspiracy, its object and accomplishment." *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273 (5th Cir.1979), *quoted in MARBA*, 675 F.2d at 886 n. 13. Here, plaintiffs allege the objects of the conspiracy (Complaint ¶ 27), but little else. Most significantly, they do not identify the parties with whom defendants are supposed to have conspired, other than to describe them as "non-labor group coconspirators" (Complaint ¶ 27) and to allege that "[u]nion contractors, associations of union contractors, suppliers of material, public utilities supplying services to the construction industry in DuPage County and other labor organizations not named

defendants herein participated and continue to participate as coconspirators with the Trades Council and Local Union defendants in the violations charged in Count III." (Complaint ¶ 13.) Similar conclusory allegations which failed to name the alleged co-conspirators and failed to allege any acts other than those of the union defendants was found to be insufficient to withstand a motion to dismiss in *Park Electric Co. v. Int'l Brotherhood of Electrical Workers, Local 701*, 540 F.Supp. 779, 781 (N.D.Ill. 1982). This Court agrees that in the absence of more specificity, the allegations of a conspiracy with non-labor parties cannot stand.

With respect to Count II, plaintiffs also argue that because defendants' conduct benefitted union contractors, the union contractors "impliedly participated with the unions," relying on *Altemose, supra.* (Resp. at 18.) *Altemose* merely held that actual agreements between unions and non-labor parties rendered the statutory exemption inapplicable; neither *Altemose* nor any other case of which the Court is aware permits a party to be considered an implicit participant in a conspiracy simply because the party receives some benefit from the conspiracy's actions.

The parties appear, however, to have overlooked an alternative way to plead a conspiracy and avoid the statutory exemption—an allegation that defendants attempted to agree, and did agree, with Imperial that Imperial's subcontracting would be limited to union subcontractors. *Connell* implicitly assumed that such an allegation was sufficient to escape the statutory exemption when it gave short shrift to this exemption and proceeded to find that picketing outside of a collective bargaining relationship aimed at coercing the plaintiff to sign a subcontracting agreement was not within the nonstatutory exemption and was subject to the antitrust laws. *See also Altemose*, 751 F.2d at 659, 661 (finding no significant distinction between an executed agreement, as in *Connell*, and an attempt to obtain an agreement). The Court finds that the alleged agreement which defendants executed or attempted to execute

with Imperial suffices to render inapplicable the statutory exemption.

### 2. Union Self–Interest

Although the Court has found the statutory exemption to be inapplicable because there is an adequately pleaded conspiracy, the Court proceeds to examine the alternative method for avoiding the statutory exemption—alleging conduct that is not in the unions' self-interest.

> [A]ctivities are in the self-interest of a labor organization "if they bear a reasonable relationship to a legitimate union interest." In particular, the labor exemption has been applied when the union acts to protect the wages, hours of employment, or other working conditions of its member-employees, objectives that are at the heart of national labor policy.

*Allied Int'l*, 640 F.2d at 1380 (citation omitted). Plaintiffs argue that defendants engaged in seven types of activities which are beyond their self-interest and which thus render the statutory exemption inapplicable.

■ First, "defendants illegally dominated the commercial construction market in the DuPage [C]ounty area through a combination of subcontractors agreements covering over 90% of the business volume." (Resp. at 15.) Such agreements are not outside of the unions' legitimate self-interest; they are a legitimate union activity which is protected by § 8(e) and not subject to antitrust laws where there is a collective bargaining relationship. *See, e.g., Woelke & Romero Framing, Inc. v. N.L.R.B.*, 456 U.S. 645, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982); *Local 210, Laborers' Int'l Union v. Labor Relations Div. Ass'd General Contractors*, 844 F.2d 69 (2d Cir.1988); *Sun–Land Nurseries, Inc. v. Southern California Dist. Council of Laborers*, 793 F.2d 1110 (9th Cir.1986), *cert. denied*, 479 U.S. 1090, 107 S.Ct. 1299, 94 L.Ed.2d 155 (1987); *Donald Schriver, Inc. v. N.L.R.B.*, 635 F.2d 859 (D.C.Cir.1980), *cert. denied*, 451 U.S. 976, 101 S.Ct. 2058, 68 L.Ed.2d 357 (1981). There is no allegation that the union subcontractor agreements—other than the agreement to which Imperial may have

become a party—were not reached within collective bargaining relationships; rather, these agreements were reached with the union contractors which are alleged co-conspirators. Plaintiffs cite *Altemose* to argue that these agreements are illegal, but *Altemose* held only that such agreements sufficed to show concerted action with non-labor entities (*see supra* at 1209).

■ Second, plaintiffs cite direct action, including picketing, taken by defendants to force contractors to enter into union subcontractor agreements or cease construction work. (Resp. at 15.) Plaintiffs offer no authority or legal argument as to why such action is beyond the statutory exemption other than their argument that the actual union subcontractor agreements reached as a result of this conduct were improper. The Court finds that this conduct does not render the statutory exemption inapplicable.

Third, "defendants exercised illegal control over the construction market through collective bargaining agreements reached with the union contractors and a verbal understanding with the all-union employers' bargaining association for the unionized sector of the construction industry in DuPage County. This understanding assured [sic: ensured] that members would let contracts only to union subcontractors." (Resp. at 15.) This charge is essentially the same as the first one, and the Court finds that it does not avoid application of the statutory exemption.

Fourth, "[b]y unwritten agreement, the union general contractor[s] would only contract with union contractors and subcontractors. Picketing was used in an attempt to coerce contractors to select union 'subs' and remove non-union 'subs' from pending projects." (Resp. at 15–16.) This argument merely rehashes the arguments made above and does not serve as a ground for avoiding the statutory exemption.

■ Skipping over the fifth and sixth arguments, which will be addressed below, plaintiffs' seventh argument is that defendants exercised "illegal control over the construction industry" through the use of

an Industry Advancement Fund which was funded by contributions from union contractors. (Resp. at 16–17.) Plaintiffs argue that the unions policed these contributions and, pursuant to the master collective bargaining agreement, had veto power over the expenditure of these funds. Plaintiffs do not offer any legal authority or explanation as to how the existence of this fund is beyond the unions' legitimate self-interest or why it should be outside of the statutory exemption.

The only allegations which the Court finds raise colorable issues as to the unions' self-interest are the fifth and sixth arguments. Plaintiffs' sixth charge is that defendants used "terrorist tactics," specifically that they "restrained trade and monopolized the market by the use of violence, threats, destruction of property, secondary picketing, and economic boycott until Imperial capitulated and did business with DuPage County unions or ceased its construction activity in the market." (Resp. at 16.) In *C & W Construction Co. v. Brotherhood of Carpenters and Joiners of America, Local 745*, 687 F.Supp. 1453 (BNA) (D.Haw. June 7, 1988), the court held that such allegations render the statutory exemption inapplicable:

> [S]ection 4 of the Clayton Act, merely states that the labor organizations may *lawfully* carry out their legitimate objectives. Section 20 of the Clayton Act exempts *peaceful* labor activity including communications aimed at persuading individuals to cease working for or patronizing particular employers. In this case, the plaintiffs allege threats of violence made to prevent C & W from obtaining necessary building materials or services. Although it may have been in the defendants' interest to ensure that the terms under which its employees worked met area standards for its workers, this union did not pursue this objection via peaceful authorized methods.

687 F.Supp. at 1464. (citations omitted; emphases in original). *See also Altemose Construction Co. v. Atlantic, Cape May, etc. Trades Council*, 493 F.Supp. 1181, 1191 (D.N.J.1980). The Court considers it a question of fact as to whether the unions utilized violence and threats, and this is one ground for holding that the statutory exemption does not apply.

Another possible ground for finding defendants' conduct to be outside the scope of the statutory exemption is plaintiffs' fifth argument, which is that defendants engaged in sham "area standards picketing" which was not area standards picketing at all but rather was designed to coerce non-union contractors to sign subcontractor agreements or use only union subcontractors. (Resp. at 16.) The Court must first examine whether there is a genuine dispute as to the purpose of the picketing. Defendants maintain that it was legitimate area standards picketing. Plaintiffs have offered no evidence to the contrary, relying only on their conclusory allegations. If defendants had argued in their motion that plaintiffs had no evidence in support of their allegation, or if defendants had included in their statement of undisputed facts an assertion that the picketing was aimed at maintaining area standards, plaintiffs' failure to set forth evidence on their behalf would require the Court to conclude that there is not a genuine dispute on this issue. However, defendants did neither of these, framing their arguments more in terms of a motion to dismiss. (Defendants apparently titled their motion as one for dismissal or summary judgment only because they found it necessary to attach certain contracts to their motion.) The Court finds that, for purposes of this motion, there is a genuine dispute as to the purpose of defendants' picketing.

Assuming that plaintiffs' characterization of the picketing is accurate, the next issue is whether such picketing is in the union's legitimate self-interest. The case law concerning the nonstatutory exemption and § 8(e) makes it clear that labor groups may pursue union subcontractor agreements only with employers or contractors with which they have collective bargaining relationships. (*Infra* at Part IV. B.) Whether this activity is legitimate is thus dependent on the result reached below, where the existence of a collective bargaining relationship is examined in or-

der to determine the applicability of the nonstatutory exemption. Because, as described below, the Court cannot find as a matter of law that there was a collective bargaining relationship, the Court cannot find, for purposes of this motion, that the unions' activity was in their legitimate self-interest. There remains a question of fact on this issue, which provides an alternative basis for the Court's finding that the statutory exemption does not require dismissal of plaintiff's complaint.

## B. Nonstatutory Exemption and Section 8(e)

The nonstatutory exemption has developed judicially to provide an antitrust exemption for certain union activities which do not fall within the statutory exemption. Its development may be traced through the Supreme Court cases of *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), *UMW v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), and *Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). *See generally MARBA, supra*, 675 F.2d at 890–92.

In *Connell*, a general contractor brought suit to nullify a union subcontractor agreement which it reached with a union as a result of union picketing. In examining the nonstatutory exemption, the Supreme Court focused on reconciling the labor policy of "tolerance for the lessening of business competition based on differences in wages and working conditions" and the antitrust policy of free competition in business markets. 421 U.S. at 622, 95 S.Ct. at 1835. The Court concluded that although

the union's goal of organizing as many subcontractors as possible was legal, the methods that the union had chosen were not exempt from antitrust laws:

> Local 100, by agreement with several contractors, made nonunion subcontractors ineligible to compete for a portion of the available work. This kind of direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions.

421 U.S. at 625, 95 S.Ct. at 1836. The Court recognized a possibility, without deciding, that such a restraint would be exempt if it were included in a collective bargaining agreement. However, where the union had no interest in organizing the company's employees, the Court found that the nonstatutory exemption did not apply. 421 U.S. at 626, 95 S.Ct. at 1836–37.[11]

Subsequent cases have followed the *Connell* analysis and held subcontractor agreements to be exempt when reached or pursued within a collective bargaining context, *see Donald Schriver, supra*, 635 F.2d 859, and not exempt when reached or pursued outside of a collective bargaining context, *see Local 210, supra*, 844 F.2d at 79–81; *Sun–Land, supra*, 793 F.2d at 1117; *Larry v. Muko, supra*, 609 F.2d 1368. *See also Altemose, supra*, 751 F.2d at 661 (where plaintiff raised question of fact as to existence of collective bargaining relationship, court could not grant summary judgment in favor of defendant trades council based on nonstatutory exemption).

A related and overlapping, but analytically distinct, body of case law has developed

---

11. In *MARBA*, the Seventh Circuit reviewed the history of the nonstatutory exemption and stated the test as follows: "[A] complaint must allege conduct operating as a direct restraint upon the business market in order to avoid application of the nonstatutory exemption. Restraints operating primarily upon the business [sic: labor] market will fall within the scope of the exemption, regardless of any indirect effect they may be alleged to have upon commercial competition." 675 F.2d at 893. *See also Larry V. Muko, Inc. v. Southwestern Penn. Bldg. and Const. Trades Council*, 609 F.2d 1368, 1373 (3d Cir.1979) ("We understand *Connell* to hold, then, that an agreement between a union and a business organization, outside a collective bargaining relationship, which imposes a direct restraint upon a business market, and which is not justified by congressional labor policy because it has actual or potential anticompetitive effects that would not flow naturally from the elimination of competition over wages and working conditions, is not exempt from antitrust scrutiny.").

with respect to the construction industry proviso of § 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e).[12] In *Connell*, after determining that the non-statutory exemption did not apply, the Supreme Court considered the union's argument that its conduct was nonetheless exempt from antitrust laws by virtue of being protected by the construction industry proviso of § 8(e). The Court examined the legislative history and policy concerns and concluded that the protection of this proviso "extends only to agreements in the context of collective bargaining relationships and ... possibly to common-situs relationships on particular jobsites as well." 421 U.S. at 633, 95 S.Ct. at 1840. *See also Sun–Land, supra*, 793 F.2d at 1113–14 (subcontractor contracts reached in context of collective bargaining agreements were within construction industry proviso of § 8(e)).

The Supreme Court in *Connell* implicitly assumed that if the union's conduct were protected by the proviso to § 8(e), it would necessarily be exempt from the antitrust laws.[13] Some of the cases decided in the wake of *Connell* have made the same implicit assumption. *See, e.g., A.L. Adams Const. Co. v. Georgia Power Co.*, 733 F.2d 853, 855–58 (11th Cir.1984), *cert. denied*, 471 U.S. 1075, 105 S.Ct. 2155, 85 L.Ed.2d 511 (1985); *Brogan v. Swanson Painting Co.*, 682 F.2d 807 (9th Cir.1982). *Cf. Consolidated Express, Inc. v. New York Shipping Ass'n*, 602 F.2d 494 (3d Cir.1979) (agreement which violates § 8(e) cannot be exempt from antitrust laws, at least where action is for declaratory or injunctive relief), *vacated on other grounds*, 448 U.S.

902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980). However, in *Sun–Land, supra*, 793 F.2d at 1114, the Ninth Circuit, sitting en banc, rejected an argument that an agreement protected by the construction industry proviso is automatically exempt from the antitrust laws. The court relied on *Pennington, supra*, in which the Supreme Court had held that an agreement is not "automatically exempt from Sherman Act scrutiny simply because the negotiations involve a compulsory subject of bargaining." 381 U.S. at 664, 85 S.Ct. at 1590. The court did hold, however, that a subcontracting clause valid under § 8(e) could not itself be the basis for an antitrust claim. 793 F.2d at 1117. *See also Larry V. Muko, supra*, 609 F.2d at 1375 (not deciding the issue, but suggesting that *Connell* should be read as holding that a violation of § 8(e) does not necessarily remove the nonstatutory exemption). *Sun–Land*'s approach was subsequently adopted by the Second Circuit in *Local 210, supra*, 844 F.2d at 73, 79–80.

Unlike the parties, who have hopelessly confused the two issues in their briefs, the Court is inclined to agree with *Sun–Land* that the § 8(e) analysis is distinct from the issue of the nonstatutory exemption. However, the issue is moot for present purposes because under both analyses the central issue becomes whether there was a collective bargaining relationship between the parties. The Court thus turns to the question of whether there existed a collective bargaining relationship between Imperial and defendants.

Although defendants do not rely on it to any great extent, they claim that a Memo-

---

**12.** Section 8(e) provides: It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void: *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work

to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work....)

**13.** The defendant union had argued that "the kind of agreement it obtained from [the contractor] is explicitly allowed by the construction-industry proviso to § 8(e) and that antitrust policy must therefore defer to the NLRA." 421 U.S. at 626, 95 S.Ct. at 1837. The Court rejected this argument because it found the agreement was not protected by the proviso without discussing whether an agreement within the scope of the proviso is automatically exempt from the antitrust laws.

randum of Agreement was executed on August 15, 1984, between Imperial and Engineers Local 150 which incorporated the master agreement between that union and the Mid–America Regional Bargaining Association. Defendants have submitted a signed copy of such an agreement, but plaintiffs dispute its validity. Plaintiffs' position is tenuous at best. They note that the document is signed by "David C. Isom" as "owner" of Imperial, and they assert that "[w]hoever 'David C. Isom' is, he was not a shareholder or owner of Imperial since plaintiff, Guy C. Cleveland, is and has always been the sole owner of plaintiff Imperial." (Resp. at 4.) However, defendants have submitted deposition testimony by Cleveland indicating that Cleveland knows who Isom is and indeed employed him. Plaintiffs thus appear to be treading on thin ground insofar as Fed.R.Civ.P. 11 is concerned. However, the Court finds that plaintiffs have succeeded in raising a genuine issue of fact on this issue, as the Court is unable to determine whether Isom was capable of binding Imperial to a contract with Engineers Local 150. Furthermore, this agreement, even if valid, can only serve to establish a collective bargaining relationship as to Engineers Local 150 and not as to the other defendants. The Memorandum of Agreement does not, therefore, establish a collective bargaining relationship as a matter of law for present purposes.

The Court thus turns to the agreement upon which defendants' primary argument is based—the March 25, 1985 letter agreement. (*See supra* at 1202.) Defendants contend that the agreement is merely a pre-hire agreement authorized by § 8(f) of the NLRA, 29 U.S.C. § 158(f).[14] If defendants are correct, then they are entitled to judgment, because the whole theory of plaintiffs' complaint, which is predicated upon the claim that the object of defendants' picketing was to cause companies to cease using non-union contractors and subcontractors, is destroyed. Rather, it would become clear that the picketing had an organizational purpose beyond the reach of the antitrust laws.[15] Plaintiffs contend that the March 25 agreement is not a § 8(f) pre-hire agreement but rather a union subcontractor agreement. If plaintiffs are correct, it may be assumed for purposes of this opinion that defendants are not entitled to judgment. (The defendants have not argued that they are entitled to judgment if the agreement is a union subcontracting contract.) There exists a third possibility as well, which neither side has recognized—that the contract is both a pre-hire agreement and a union subcontractor agreement. Because defendants have not contended that they are entitled to judgment in this event, the Court assumes for present purposes that they are not.

In support of their argument that the March 25 contract is merely a pre-hire agreement, defendants rely primarily on

**14.** The relevant portion of § 8(f) provides:
It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such an agreement ... *Provided,* That nothing in this subsection shall set aside the final proviso to subsection (a)(3) of this section: *Provided further,* That any agreement which would be invalid, but for clause (1) of

this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(d) of this title.
For descriptions of the background and effect of § 8(f), see *Mesa Verde Const. Co. v. Northern California Dist. Council of Laborers,* 861 F.2d 1124 (9th Cir.1988); John Deklewa & Sons, 282 NLRB No. 184, 124 L.R.R.M. 1185 (1988), *enf'd, Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 3 v. NLRB,* 843 F.2d 770 (3d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988).

**15.** This does not mean, of course, that defendants' conduct is necessarily legal as a matter of labor law. *See Deklewa & Sons, supra,* 124 LRRM at 1194 ("an employer cannot be coerced, through strikes or picketing, into negotiating or adopting an 8(f) agreement"). *See also Donald Schriver, supra,* 635 F.2d at 868.

the language of the contract itself. "Labor," they argue, can refer only to employees of Imperial itself. They point out that the contract nowhere refers to contractors or subcontractors. Furthermore, they cite evidence that Imperial did employ construction workers. (Defendants rely on a claimed contract between Imperial and the Owner, in which Imperial agreed to perform site grading work, and the collective bargaining agreement between Imperial and Engineers Local 150. Plaintiffs dispute the authenticity of both of these documents.)

In response, plaintiffs contend that Imperial was a construction manager which did not employ construction workers. It thus would make no sense for Imperial to sign a pre-hire agreement relating to employees.[16] Plaintiffs stress that the picketing was occasionally directed at various subcontractors but that Imperial was never picketed with respect to its performance of site grading work. Furthermore, plaintiffs argue that the requirements for a valid § 8(f) contract have not been fulfilled. "Under section 8(f), a pre-hire agreement exists if 1) it covers employees who are engaged in the building and construction industry; 2) the agreement is with a labor organization of which building and construction employees are members; and 3) the agreement is with an employer engaged primarily in the building and construction industry." Clark v. Ryan, 818 F.2d 1102, 1107 (4th Cir.1987). See also Operating Engineers Pension Trust v. Beck Engineering & Surveying Co., 746 F.2d 557, 561 (9th Cir. 1984). Because the labor signatory to the March 25 agreement is not a labor organization of which employees are members, but rather an organization of unions, plaintiffs contend that the second requirement is not fulfilled. It may also be argued on behalf of plaintiffs that the March 25 agreement is certainly unlike standard § 8(f) agreements, which generally are comprehensive collective bargaining agreements or are included in such agreements. See, e.g., Clark, supra; Wyoming Laborers Health & Welfare Pl. v. Morgen & Oswood, 850 F.2d 613, 615 (10th Cir.1988); Operating Engineers Pension Trust v. Cecil Backhoe, 795 F.2d 1501 (9th Cir.1986); American Metal Products, Inc. v. Sheet Metal Workers Int'l Ass'n, 794 F.2d 1452 (9th Cir.1986); Donald Schriver, supra, 635 F.2d at 859. See also IBEW, Local Union No. 441 v. KBR Electric, 812 F.2d 495, 497 (9th Cir.1987) ("A pre-hire agreement is a collective bargaining agreement that recognizes a minority union as the exclusive bargaining representative for a company's employees"); John Deklewa & Sons, 282 NLRB No. 184, 124 L.R.R.M. 1185 (1988) (assuming throughout that a § 8(f) agreement is a type of collective bargaining agreement) enf'd, Int'l Ass'n of Bridges, Structural and Ornamental Iron Workers, Local 3 v. NLRB, 843 F.2d 770 (3d Cir.), cert. denied, — U.S. —, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988).

Plaintiffs' contentions are sufficient to create a genuine issue of fact with respect to the meaning of the March 25 agreement. This case is similar in this respect to Altemose, supra, in which the court concluded that there was a question of fact as to the existence of a collective bargaining relationship and therefore held that summary judgment in favor of the defendants on the basis of the antitrust exemptions was not proper. 751 F.2d at 661–62. Under all of the circumstances of this case, the Court cannot find as a matter of law that the term "labor" in the March 25 agreement refers to Imperial's own employees or future employees rather than to subcontractors; in other words, the Court cannot conclude that the agreement is a § 8(f) pre-hire agreement rather than a union subcontracting agreement. Accordingly, the Court cannot conclude that a collective bargaining context has been established or that defendants' actions are exempt from antitrust liability as a matter of law.[17]

---

**16.** This factor is not determinative in itself. In A.L. Adams, supra, the court held that a construction manager may take advantage of § 8(f) even though it does not employ construction workers. 733 F.2d at 857–58.

**17.** Defendants also argue that the complaint fails to state a claim under the antitrust laws, contending that the antitrust laws do not govern the elimination of competition based on wages and working conditions. This argument, however, is not analytically distinct from the arguments based on the labor exemptions to the antitrust laws, and it does not merit separate discussion.

## V. CONCLUSION

Defendants' motion for judgment on the pleadings is denied because they have acquiesced in any claim splitting by plaintiffs and have not satisfied the elements of collateral estoppel. Defendants' motion for dismissal or summary judgment is denied because there are disputed issues of material fact with respect to the purposes of defendants' picketing and the meaning of the March 25, 1985 agreement, and the Court cannot find as a matter of law that defendants are entitled to the benefit of the statutory and nonstatutory exemptions to the antitrust laws.